VIRGINIA L. DALEY ET AL. *v.* AETNA LIFE
AND CASUALTY COMPANY ET AL.
(SC 16083)

Callahan, C. J., and Norcott, Katz, Palmer and Peters, Js.

Argued June 2—officially released August 3, 1999

*Philip L. Steele*, for the appellants (plaintiffs).

*Steven M. Greenspan*, with whom were *Elizabeth A. Alquist* and, on the brief, *James W. Caley*, for the appellees (defendants).

*Jonathan L. Gould* filed a brief for the Connecticut Employment Lawyers Association as amicus curiae.

*Opinion*

KATZ, J. The named plaintiff, Virginia L. Daley (Daley),[1] an at-will employee, brought an action against her former employer, Aetna Life & Casualty Company (Aetna), and Michele Flynn, a regional manager at Aetna and Daley's supervisor, claiming, inter alia, wrongful termination of her employment allegedly in retaliation for statements that she had made that were critical of Aetna's failure to implement its highly publicized "family-friendly" workplace policies. The trial court directed a verdict in favor of the defendants on certain counts, and the jury returned a verdict in favor of the defendants on Daley's remaining claims. Thereafter, the trial court rendered judgment on all counts for the defendants. This appeal followed.

## I

## BACKGROUND FACTS

The jury reasonably could have found the following facts. Daley had worked for Aetna from October, 1985, until her discharge in November, 1993. She was hired initially as an interior designer to work on a long-term project to renovate Aetna's home office. In 1989, she transferred to Aetna's corporate leasing department, where she was responsible for coordinating design development and modifying Aetna's field offices nationwide. For the years 1989 and 1990, Daley received

---

[1] Brian Daley, Virginia Daley's husband, was also a plaintiff in the trial court, and now appeals from that court's judgment in favor of the defendants on his claim for loss of spousal consortium. Because Brian Daley's claim is wholly derivative of Virginia Daley's, and we affirm the trial court's decision in favor of the defendants on all counts, his claim necessarily fails. We therefore do not refer to him separately in his role as plaintiff and references herein to Daley are to Virginia Daley.

annual performance evaluations in which several supervisors expressed dissatisfaction with her work, including her inability to communicate effectively with colleagues and clients, her persistent failure to meet project deadlines, her failure to take action on important assignments, and her failure to accept responsibility for her own shortcomings.

In November, 1990, Flynn began work at Aetna as a regional manager, and Daley's supervisor, in Aetna's corporate leasing department. Soon thereafter, Aetna announced a major reorganization and restructuring, scheduled to begin the following year, which called for a reduction in the number of designers in the corporate leasing department. Around that same time, Daley informed Flynn that she was pregnant.

In early 1991, Flynn assessed Daley's work performance for the previous year and noted in her written evaluation Daley's continued inability to complete projects on time and her failure to update colleagues and clients on the status of ongoing projects. Flynn offered Daley specific suggestions to improve her performance, including suggestions that she organize and manage her time more efficiently, plan her projects more carefully, prioritize her workload, and develop teamwork skills to coordinate and improve communication with team members. Soon thereafter, Flynn approved a $2100 raise for Daley.

In July, 1991, Daley gave birth to a son and commenced a six week period of paid maternity leave, followed by an additional two weeks of paid vacation time. Sometime during her initial absence, Daley telephoned Flynn to request an alternative schedule to take effect upon her return that would enable her to work from home one day per week. After discussing Daley's request with her superiors, Flynn decided that, given the effects of the ongoing reorganization process, including

increased workload, the decreased staff, the team-oriented environment, the need to train staff members with new procedures, and the changing needs of the department's customers, she could not accommodate a work-at-home schedule. At the time, Daley considered Flynn's decision to deny her request reasonable.

Daley returned to work on September 15, 1991, in the midst of Aetna's reorganization. By October of that year, eight designers in the corporate leasing department had lost their jobs. Daley, however, was one of the designers chosen to remain in the department. Flynn, in concert with two other regional managers, had promoted Daley to a new position as design project manager, where she would undertake greater responsibility for project management as opposed to actual hands-on design.

By mid-November, 1991, Daley brought her request to arrange a work-at-home schedule to Lorraine Hritzko, an Aetna human resources representative. After discussing the request with management, Hritzko informed Daley that management still considered it an inappropriate time to accommodate her work-at-home request. Shortly thereafter, Daley sought permission from Flynn to use one day per week as vacation time through the end of the year. Flynn denied that request.

At or about the same time, Flynn approached Daley to express concern about Daley's continued inability to complete key projects in a timely fashion. On November 25, 1991, in response to that conversation, Daley sent Flynn a letter in which she pledged to "get very serious about producing the quantity and quality of work that is required." Thereafter, beginning in January, 1992, Flynn met with Daley weekly to discuss Daley's progress and to review strategies for improving work performance. Despite these efforts, Flynn concluded in Daley's 1991 evaluation that: Daley had failed to display

the level of commitment required to attain increased project loads; she continued to have difficulty in meeting deadlines; and her inadequate performance damaged the ability of the unit to achieve its objectives. Daley acknowledged her unsatisfactory work record and, for a second time, promised to improve her performance. Despite her representations, over the next three months Daley continued to produce substandard work.

In the beginning of February, 1992, Daley approached Hritzko a second time seeking to arrange an alternative work schedule. When that request was denied, Daley told Hritzko that management's unwillingness to accommodate her work-at-home request was not consistent with "meeting what the company said about its family flexibility program," and that she "was going to have a real problem if this doesn't get ironed out in one way or the other . . . ."

By March 9, 1992, Daley's work showed no signs of improvement. Consequently, Flynn issued Daley a written warning, the first step in Aetna's progressive discipline policy. In accordance with that policy, Flynn advised Daley that if her performance did not improve within the next twelve months, she would be placed on probation. After a temporary improvement in the quality of her work, Daley's performance deficiencies resurfaced. On October 21, 1992, Flynn placed her on a thirty day probation.

On November 9, 1992, Aetna's internal newspaper ran an article discussing a "Good Guy" award presented to Aetna chairperson Ronald Compton by the National Women's Political Caucus in recognition of Compton's support of model family and medical leave programs. One week later, after reviewing the article, Daley drafted an interoffice memorandum to Compton expressing her dissatisfaction with Aetna's "flexible family [work] arrangements . . . ." The memorandum

described Daley's own experiences in attempting to secure a work-at-home schedule, and her disappointment with Aetna's failure to implement its heavily promoted flexible scheduling policies. The memorandum also described the experiences of five unidentified coworkers, two of whom had allegedly left the company because management had denied their alternative schedule requests, and three of whom remained at Aetna despite having been denied requests for alternative schedules. The memorandum further urged that department managers be given the flexibility to fashion staffing schedules that would allow employees to balance workload demands with family obligations, and that various employee relations departments be given the authority to ensure that Aetna adheres to its family flexible policies.

On December 1, 1992, two weeks after Daley sent her memorandum to Compton, Flynn recognized an improvement in her work performance and removed her from probationary status. In a formal memorandum, Flynn advised Daley that failure to maintain a satisfactory level of performance over the next twelve months would constitute grounds for termination. By February, 1993, Daley again had failed to meet critical deadlines and had neglected to inform other team members of the status of ongoing projects. On one occasion, Daley represented to Flynn, prior to leaving on a business trip, that three key projects were proceeding as scheduled. In reality, she had neglected to order materials necessary for the completion of those projects, and had failed to coordinate with team members regarding the status of those projects. On February 10, 1993, citing long-standing performance deficiencies, Aetna terminated Daley's employment.

By revised complaint dated March 4, 1994, Daley initiated an action against the defendants on the following eleven counts: (1) retaliatory discharge under General

Statutes § 31-51q;[2] (2) common-law wrongful discharge; (3) negligent misrepresentation; (4) fraudulent misrepresentation; (5) tortious interference with employment;[3] (6) defamation; (7) negligent investigation and supervision; (8) negligent representation on behalf of Daley's son; (9) loss of mother-child consortium on behalf of Daley's son; (10) loss of family consortium by Daley's husband; and (11) loss of mother-child consortium.

The defendants moved to strike all but counts three, four and ten. The trial court, *Sheldon, J.,* denied the motion with respect to counts one, two and six, and granted the motion with respect to the remaining counts. Thereafter, by amended complaint dated August 2, 1996, Daley repleaded counts one through six, and count ten, and asserted a new claim for negligent employment practices under General Statutes § 31-49.[4] After a trial on the merits, the trial court, *Aurigemma, J.,* directed a verdict for the defendants with respect

[2] General Statutes § 31-51q provides in relevant part: "Liability of employer for discipline or discharge of employee on account of employee's exercise of certain constitutional rights. Any employer . . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. . . ."

[3] Daley asserted this claim solely against Flynn.

[4] General Statutes § 31-49 provides: "Care required of a master for his servant's safety. It shall be the duty of the master to exercise reasonable care to provide for his servant a reasonably safe place in which to work, reasonably safe appliances and instrumentalities for his work and fit and competent persons as his colaborers and to exercise reasonable care in the appointment or designation of a vice-principal and to appoint as such vice-principal a fit and competent person. The default of a vice-principal in the performance of any duty imposed by law on the master shall be the default of the master."

to Daley's common-law wrongful discharge and interference with employment counts, and her statutory negligent employment practices count. The jury returned a verdict in favor of the defendants on the remaining counts. Thereafter, Daley moved for a new trial and the trial court denied her motion. Daley appealed to the Appellate Court from the trial court's judgment, and pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c), we transferred the matter to this court. We now affirm the judgment on all counts.

Daley raises several issues on appeal: (1) whether the trial court improperly failed to rule as a matter of law that her memorandum to Compton addressed a matter of public concern such that, pursuant to § 31-51q, the statements contained therein could not serve as a legitimate basis for employee discipline; (2) whether the trial court properly instructed the jury regarding her negligent misrepresentation claim; (3) whether, in asking the jury to determine whether allegedly defamatory statements were statements of fact or opinion, the trial court improperly declined to set forth independently each statement in the jury verdict form; and (4) whether the trial court incorrectly directed a verdict in favor of the defendants on her common-law wrongful discharge and tortious interference with employment claims, and her statutory negligent employment practices claim.

We conclude, with respect to Daley's claim of retaliatory discharge under § 31-51q, that where the content, form or context of a particular statement is in dispute, the determination of whether that statement constitutes protected speech involves a mixed question of law and fact, and that, under the circumstances of this case, it was within the trial court's discretion to have the jury decide whether Daley's memorandum to Compton addressed a matter of public concern. In addition, we conclude that the trial court properly instructed the jury

regarding Daley's claim of negligent misrepresentation, and, with respect to Daley's claim of common-law defamation, properly declined to set forth independently each allegedly defamatory remark in the verdict form. Finally, we conclude that the trial judge properly entered a directed verdict in favor of the defendants on Daley's remaining counts of wrongful termination, unlawful interference with employment, and negligent employment practices. Accordingly, we affirm the judgment of the trial court.

## II

### RETALIATORY DISCHARGE UNDER § 31-51q

We first address Daley's claim that the trial court improperly declined to rule as a matter of law that her memorandum to Compton addressed a matter of public concern, and therefore, constituted protected speech under § 31-51q. Section 31-51q protects from retaliatory discharge an employee who invokes constitutionally guaranteed free speech rights that, in turn, protect statements that address a matter of public concern. *D'Angelo* v. *McGoldrick*, 239 Conn. 356, 360, 685 A.2d 319 (1996). Daley contends that whether the statements included in her memorandum addressed a matter of public concern involves a question of law for the court, and therefore, the trial court improperly submitted that question to the jury. Daley argues in the alternative that, even if the issue of whether her statements addressed a matter of public concern involves a question of fact to be resolved by the jury, the trial court's instructions on that issue failed to provide the jury with sufficient guidance in reaching its verdict.

The defendants, on the other hand, argue that Daley is not protected by § 31-51q because the statute does not apply to speech that occurs at a private work site. In the alternative, the defendants contend that, even if § 31-51q does apply under such circumstances, the trial

court properly declined to rule as a matter of law that Daley's memorandum addressed a matter of public concern. According to the defendants, whether Daley's memorandum addressed a matter of public concern depends on her motivation for drafting the memorandum in the first instance. Because her motivation was a disputed question of fact, the defendants argue, the trial court properly submitted to the jury the question of whether that memorandum addressed a matter of public concern. The defendants further assert that the trial court's instructions were adapted adequately to the issues presented and were sufficient to guide the jury in reaching its verdict.

We need not address whether § 31-51q applies to speech that occurs at a private work site.[5] Assuming, without deciding, that § 31-51q does apply in such circumstances, we conclude that Daley cannot prevail. Section 31-51q applies to constitutionally protected speech, that is to say, speech that addresses a matter of public concern. We conclude herein that whether the subject matter addressed by a particular statement is of public concern involves a question of law for the court. We further conclude herein that whether a particular statement addresses such a matter depends on its content, its form, and the context in which it is made. This later inquiry necessarily involves a question of fact.

In this case, the parties disagreed as to whether Daley drafted her memorandum in the context of a personal employment dispute, or as a citizen concerned about the availability of family-friendly scheduling alternatives. As we discuss hereinafter, the resolution of that question, and consequently, the resolution of whether

---

[5] We recognize that there exists considerable disagreement regarding the legislature's intent to expand the scope of constitutional protections vis-a-vis their application to the public versus private domain through the enactment of § 31-51q. See *Cotto* v. *United Technologies Corp.*, 48 Conn. App. 618, 711 A.2d 1180, cert. granted, 245 Conn. 915, 717 A.2d 233 (1998).

her memorandum addressed a matter of public concern
such that it was protected under § 31-51q, turns, in part,
on Daley's motivation for drafting the memorandum in
the first instance. Because motivation is a quintessential
issue of fact, we conclude that the trial court properly
submitted to the jury the question of whether Daley's
memorandum addressed a matter of public concern.
Moreover, we conclude that the trial court's instruc-
tions were sufficiently adapted to the facts of the case
to furnish a proper guide for the jury in reaching its
verdict.

### A

#### Determinations of Fact and Law Under § 31-51q

Section 31-51q protects an employee from retaliatory
discharge due to that employee's exercise of certain
enumerated rights, including, inter alia, the right to free-
dom of expression as guaranteed by the first amend-
ment to the United States constitution, and article first,
§ 4, of the Connecticut constitution.[6] D'Angelo v. McGol-
drick, supra, 239 Conn. 357; Lewis v. Gaming Policy
Board, 224 Conn. 693, 711, 620 A.2d 780 (1993). Those
constitutional provisions safeguard statements made
by an employee that address a matter of public concern,
but provide no security with respect to statements that
address wholly personal matters. See Connick v. Myers,
461 U.S. 138, 147–49, 103 S. Ct. 1684, 75 L. Ed. 2d 708
(1983) (extending constitutional protection to state-
ments regarding pressure on public employees to work
for political candidates not of their choice, but not to
statements regarding internal office procedures); Luck
v. Mazzone, 52 F.3d 475, 476 (2d Cir. 1995) (declining

---

[6] Daley makes no claim that article first, § 4, of the Connecticut constitu-
tion is any broader than the first amendment to the United States constitu-
tion. Accordingly, our inquiry is limited to that speech which is protected
under the federal constitution.

to extend constitutional protection to statements critical of building maintenance operations); *Schnabel* v. *Tyler*, 230 Conn. 735, 756, 646 A.2d 152 (1994) (ruling that statements regarding police misconduct address matter of public concern). In *Connick*, the United States Supreme Court established the test for determining whether an employee's speech addresses a matter of public concern. Speech that addresses a matter of public concern involves statements that can "be fairly considered as relating to any matter of political, social, or other concern to the community . . . ." *Connick* v. *Myers*, supra, 146; *Donahue* v. *Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir. 1987) (asking whether speech relates to "topical concerns in our society"). That determination is made by evaluating "the content, form, and context of a given statement, as revealed by the whole record." *Connick* v. *Myers*, supra, 147–48; *Schnabel* v. *Tyler*, supra, 751.

Pursuant to the analysis set forth in *Connick*, the federal courts of appeals take various approaches in determining whether a particular statement made by an employee is constitutionally protected. "Some courts have adopted a content-based analysis, focusing exclusively on which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government, *McKinley* v. *City of Eloy*, 705 F.2d 1110, 1113–14 (9th Cir. 1983) (quoting *Thornhill* v. *Alabama*, 310 U.S. 88, 102, 60 S. Ct. 736, 744, 84 L. Ed. 1093 [1940]), in effect providing per se protection to public-employee speech on certain topics of inherent public interest, such as official malfeasance or abuse of office. See *Koch* v. *City of Hutchinson*, 847 F.2d 1436, 1446 n.17 (10th Cir.) (en banc), cert. denied, 488 U.S. 909, 109 S. Ct. 262, 102 L. Ed. 2d 250 (1988). Other courts have adopted an analysis which turns either entirely or in part on the employee's subjective intent, i.e., on whether the employee's speech

was calculated to disclose misconduct or to inspire public debate on some issue of significant public interest. *Conway* v. *Smith*, 853 F.2d 789, 796 (10th Cir. 1988) . . . see also *Callaway* v. *Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987) (while the content of [the plaintiff's] communications touched upon an issue of public concern generally . . . such speech stands unprotected from employer scrutiny when uttered in the pursuit of purely private interests); *Terrell* v. *University of Texas System Police*, 792 F.2d 1360, 1362 (5th Cir. 1986), cert. denied, 479 U.S. 1064, 107 S. Ct. 948, 93 L. Ed. 2d 997 (1987) (the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment); *Linhart* v. *Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985) (*Connick* requires us to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?)." (Internal quotation marks omitted.) *O'Connor* v. *Steeves*, 994 F.2d 905, 913 (1st Cir.), cert. denied sub nom. *Nahant* v. *O'Connor*, 510 U.S. 1024, 114 S. Ct. 634, 126 L. Ed. 2d 593 (1993).

The United States Court of Appeals for the Second Circuit adheres to the latter view and examines the employee's motive, regardless of whether the subject matter of a particular statement is of inherent interest to society at large, "to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Lewis* v. *Cowen*, 165 F.3d 154, 163–64 (2d Cir. 1999); see also *Harman* v. *New York*, 140 F.3d 111, 119 (2d Cir. 1998) (examining whether speaker was motivated by "a desire to continue contributing to the public debate" when criticizing practices and policies of social services agency); *Blum* v. *Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994) ("the fact that an employee's speech [critical of

national drug policy] touches on matters of public concern will not render that speech protected where the employee's motive for the speech is private and personal"); *Ezekwo* v. *New York City Health & Hospitals Corp.*, 940 F.2d 775, 781 (2d Cir.), cert. denied, 502 U.S. 1013, 112 S. Ct. 657, 116 L. Ed. 2d 749 (1991) (examining whether speaker was "on a mission to protect the public" despite inherent public interest in criticisms aimed at quality of physician training program). Pursuant to this analysis, if it is determined that an employee spoke "not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest," the statement is not protected, and courts generally will not second guess the propriety of a personnel decision made by an employer allegedly in reaction to the employee's behavior. *Connick* v. *Myers*, supra, 461 U.S. 147; *Schnabel* v. *Tyler*, supra, 230 Conn. 751.

On appeal, Daley claims that whether a statement addresses a matter of public concern is a question of law that must be resolved by the trial court. She further argues that because her memorandum to Compton criticized Aetna for failing to accommodate employee scheduling requests, a topic of general import to working families, the trial court should have determined that her memorandum addressed a matter of public concern. For authority, Daley relies on the Supreme Court's statement in *Connick* that "[t]he inquiry into the protected status of speech is one of law, not fact." *Connick* v. *Myers*, supra, 461 U.S. 148 n.7. The question before the court in *Connick*, however, was whether certain questions that pertained to an assistant prosecutor's dissatisfaction with the internal operating policies of the district attorney's office addressed a matter of public concern such that those statements were protected under the first amendment. The court's resolution of that legal question was predicated upon a finding that

the prosecutor's questions did, as a matter of fact, pertain to internal operating policies. In *Connick*, the prosecutor had distributed an interoffice questionnaire to her colleagues that inquired into their confidence and trust in various supervisors, the level of office morale, and the need to establish an employee grievance committee. The court noted, pursuant to an examination of the "content, form, and context" of the questions; id., 147–48; that the prosecutor had made no attempt to inform the public of her concerns, nor had she sought to "bring to light actual or potential wrongdoing or breach of public trust on the part of [her employer]." Id., 148. Accordingly, the court characterized the questions as "mere extensions" of an internal employment dispute that "reflect[ed] one employee's dissatisfaction with [an office] transfer . . . ." Id. Such statements, the court concluded, as a matter of law, are not of public concern and, therefore, do not warrant constitutional protection. Id., 147–48.

We read *Connick*, therefore, as standing for the proposition that it is within the province of the trial court to determine, as a matter of law, which topics are considered to be of public concern. The resolution of whether an employee's statements address such a topic is, however, within the province of the jury, to be determined by looking to the content, form and context of the particular statements in question. See id., 147–48.

Our decision in *Schnabel* accords with this determination as to the breadth of *Connick's* holding that the question regarding the protected status of speech is one of law, but that the question regarding the content, form and context of the speech in question is one of fact. *Schnabel* involved a federal civil rights action brought under 42 U.S.C. § 1983 by a police officer who claimed to have been discharged in retaliation for speaking out against instances of police misconduct. With respect to

certain statements pertaining to the alleged impropriety, we stated that "the issue of whether [the officer's] written communications constituted protected conduct should not have been given to the jury, *as their content was undisputed,* and therefore the question was one of law." (Emphasis added.) *Schnabel* v. *Tyler,* supra, 230 Conn. 752 n.10. On appeal, we determined "as a matter of law, that all of [those] statements [regarding police misconduct] involved a matter of public concern." Id. In that same case, however, we treated differently other statements made by the police officer, the contents of which *were* in dispute. With respect to those statements, we took no issue with the trial court's conclusion that the jury "should resolve this factual dispute to determine whether the speech involved a matter of public concern." Id., 752. In reaching its decision, the jury had determined that the disputed communication concerned the police department's response to citizen complaints and the public perception of that response. Id., 752–53. Pursuant to that factual finding, the trial court drew the legal conclusion that such statements, as a matter of law, addressed a matter of public concern and, therefore, constituted protected speech. Id., 752 n.10.

The case before us involves a factual dispute between the parties regarding the context in which Daley's statements were made, namely, whether she articulated her dissatisfaction with Aetna's alternative work schedule policies as a concerned citizen or as an employee set on airing a personal grievance. It is well settled that internal employment policies are not a matter of public concern. See *Connick* v. *Myers,* supra, 461 U.S. 147; *Bernheim* v. *Litt,* 79 F.3d 318, 324 (2d Cir. 1996) (dispute between employee and employer regarding general working conditions not matter of public concern); *Luck* v. *Mazzone,* supra, 52 F.3d 477 (building maintenance operations not of public concern); *Ezekwo* v. *New York*

*City Health & Hospital Corp.*, supra, 940 F.2d 781 (personnel decision made by director of hospital residency program not matter of public concern). Daley admits as much, but argues that her memorandum addressed not her own private dispute with Aetna management, but the availability of flexible scheduling options at Aetna, a topic of general concern to working parents. In this regard, Daley asserts that she referenced her own employment situation in the body of her memorandum only in the context of speaking out as a citizen concerned about the differences between Aetna's public position and private policy concerning flexible work arrangements. She points specifically to her assertions that Aetna was misrepresenting its policies to "the national media," that such a misrepresentation could damage Aetna's professional reputation with "the general public," and that Compton was undeserving of the "Good Guy" award he received from the National Women's Political Caucus. According to Daley, therefore, the court should have determined as a matter of law that her memorandum addressed a matter of public concern.

Daley's argument overlooks the fact that whether her memorandum falls within the purview of the first amendment does not turn solely on whether the statements contained therein are of general interest to working parents. Even if the availability of flexible work schedules at Aetna was a matter of "topical [concern] in our society"; *Donahue* v. *Windsor Locks Board of Fire Commissioners*, supra, 834 F.2d 58; that would not obviate the need for a factual inquiry into her motivation for making such statements. Daley still bears the burden of establishing that she was motivated to champion the rights of others, rather than to air her own personal grievance with Aetna management. Whether she met that burden involves a question of fact to be resolved by the jury. See *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 250, 618 A.2d 506

(1992) (recognizing motive as question of fact that, when disputed, precludes grant of summary judgment). Therefore, we conclude that the trial court properly declined to rule as a matter of law that Daley's memorandum addressed a matter of public concern.[7]

## B

### Jury Instructions on Daley's § 31-51q Claim

Our conclusion that the trial court did not act improperly in failing to rule as a matter of law that Daley's memorandum addressed a matter of public concern does not end our inquiry. Daley claims that, "[e]ven if the issue of whether [her] speech was constitutionally protected were an issue of fact for the jury to decide, the trial court did not adequately instruct the jury on the law applicable to protected speech under [§] 31-51q." We disagree.

The legal principles that guide our consideration of Daley's claim of improper jury instructions are well

---

[7] We find no merit to Daley's claim that the trial court improperly failed to adhere to the "law of the case" governing her § 31-51q claim. *CFM of Connecticut, Inc.* v. *Chowdhury,* 239 Conn 375, 404, 685 A.2d 1108 (1996) (doctrine of "the law of the case" foreclosed further consideration of issue already litigated and decided); *State* v. *Arena,* 235 Conn. 67, 80, 663 A.2d 972 (1995), quoting *Breen* v. *Phelps,* 186 Conn. 86, 99, 439 A.2d 1066 (1982) ("law of the case" doctrine discussed). In a memorandum of decision on the defendants' August 3, 1994 motion to strike, the trial court, *Sheldon, J.,* ruled as follows: "*Taking the facts pleaded in the light most favorable to [Daley], and considering all well-pleaded facts as true,* [Daley's] memorandum can fairly be construed as a generalized complaint about Aetna's allegedly misleading public image rather than as a plea to honor her own request for a flexible work schedule." (Emphasis added.) Contrary to Daley's assertion, this decision did not dictate that the statements contained in her memorandum constituted protected speech as a matter of law, nor that her motivation was irrelevant to the protected status of her memorandum. Rather, upon review of the evidence presented at trial, the jury was to decide whether Daley's statements were motivated by her own employment situation. Accordingly, Daley's claim lacks merit.

established. "The test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . *Atlantic Richfield Co.* v. *Canaan Oil Co.*, 202 Conn. 234, 240, 520 A.2d 1008 (1987). Thus, we must determine whether the charge as a whole presents the case to the jury so that no injustice will be done. *State* v. *Derrico*, 181 Conn. 151, 170, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). . . . [The] [j]ury instructions need not be exhaustive, perfect, or technically accurate. . . . *Preston* v. *Keith*, 217 Conn. 12, 17, 584 A.2d 439 (1991). Nonetheless, the trial court must correctly adapt the law to the case in question and must provide the jury with sufficient guidance in reaching a correct verdict. Id." (Citation omitted; internal quotation marks omitted.) *Stewart* v. *Federated Dept. Stores, Inc.*, 234 Conn. 597, 603, 662 A.2d 753 (1995). In determining whether the trial court's instructions meet this standard, we review the jury charge "in the context of the factual issues raised [in each case]." (Internal quotation marks omitted.) *State* v. *Austin*, 244 Conn. 226, 237, 710 A.2d 732 (1998).

The critical flaw in the court's instructions, according to Daley, is that they left the impression that speech cannot be protected if it *in any way* involves a matter of personal concern. In other words, Daley contends that the trial court misinformed the jury that unless the memorandum involved *only* a matter of public concern, it would not be protected pursuant to § 31-51q.

We agree with Daley that statements regarding internal employment policies may raise at once issues that are of both personal and public concern. See, e.g., *Donahue* v. *Windsor Locks Board of Fire Commissioners*, supra, 834 F.2d 58 (that instances of sex based

discrimination and statutory violations by employer were of significance to employee "neither diminishes the public importance of these concerns nor strips [the] speech of protection"). The trial court's instructions, however, cannot reasonably be construed as leaving the jury with the misimpression that the public/private import of a particular statement is an either/or proposition. In charging the jury to consider whether the statements contained in Daley's memorandum addressed a matter of public concern, the court explained that "[i]t is not enough if [Daley] complained about *purely* private matters such as the terms and conditions of her employment. Instead, [Daley] must have intended to speak on a broader issue of public concern." (Emphasis added.) The court went on to charge the jury that, "[t]he issue you must resolve is whether, acting as she did, [Daley] was acting as a citizen attempting to speak out on a public issue, or whether she was instead a disgruntled employee attempting to resolve a private dilemma regarding the terms and conditions of her own employment. In short, [Daley's] comments are not protected under § 31-51q if they were only directed at issues concerning herself and her employer."

We are persuaded that the trial court's instructions properly informed the jury that Daley's memorandum does not address a matter of public concern if she complained of a matter "purely" private in nature, or if her complaints were directed "only" at issues concerning her employment. The instructions do not, however, imply the converse, that is, that constitutional protection will attach to the statements in question if those statements address "only" a matter of public concern. Therefore, we conclude that the trial court's instructions adequately comported to the facts of the case and properly guided the jury in reaching its verdict. Accordingly, we affirm the verdict in favor of the defendants on this claim.

## III

## REDACTION OF MEMORANDUM

We next address Daley's claim that the trial court improperly redacted certain statements from her memorandum to Compton before admitting that memorandum into evidence. The two sentences redacted from the memorandum read as follows: "I know of two people in my department alone, that have left the company in the last six months because they could not secure a flexible working arrangement and three others that have requested similar situations and have been turned down. That's a 17 [percent] success rate, which is a failure by any measure."

At trial, the defendants claimed that, because the sentences in question reflected statements allegedly made to Daley by unidentified Aetna employees, those sentences were inadmissible hearsay. In response, Daley contended that she offered the statements, not as proof that two former employees had in fact left Aetna due to their inability to secure a flexible work schedule, but to demonstrate the content, form and context of her memorandum; see *Connick* v. *Myers*, supra, 461 U.S. 147–48; and that the statements contained therein addressed "a general concern and not merely [her] private situation . . . ." Daley claimed that the two sentences were also relevant to show that her managers, including Flynn and another superior, had a motive to retaliate against her for going over their heads in bringing her concerns to the attention of upper management. Accordingly, she argued that the sentences were relevant regardless of their truth, and, therefore, should not have been redacted from the memorandum. The trial court agreed with the defendants that the two sentences were hearsay, and further found that their probative value was outweighed by their potentially prejudicial effect. Consequently, the

court ordered that the statements be redacted. Upon our review of the record, we find that the trial court's evidentiary ruling was not an abuse of discretion, and, accordingly, we affirm that decision.

In reviewing Daley's challenge, we are mindful that "[t]he trial court's ruling on the admissibility of evidence is entitled to great deference. *State* v. *Castonguay*, 218 Conn. 486, 497, 590 A.2d 901 (1991); *State* v. *Sharpe*, 195 Conn. 651, 659, 491 A.2d 345 (1985). [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . *State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91 (1997)." (Internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 229–30, 733 A.2d 156 (1999).

In challenging the defendants' hearsay objection, Daley purported to offer the statements, not to demonstrate the truth contained therein, but, rather, to show that her memorandum was meant to address the general status of Aetna's family-friendly workplace policies. In this regard, however, the relevance of the statements hinges on their truth, which Daley failed to establish. Indeed, at trial, Daley offered no evidence to substantiate the veracity of the statements in question. It therefore cannot be said that the trial court abused its discretion in characterizing the statements as hearsay; *Pagano* v. *Ippoliti*, 245 Conn. 640, 650, 716 A.2d 848 (1998) (defining hearsay as out-of-court statements offered to prove truth contained therein); and in ordering their redaction. *State* v. *Oquendo*, 223 Conn. 635, 664, 613 A.2d 1300 (1992) (ruling hearsay inadmissible absent indication that such evidence qualifies under well established exception).

We reach the same conclusion even assuming, arguendo, that the statements regarding other Aetna

employees are relevant, independent of their truth, with respect to Daley's motivation for drafting the memorandum, and consequently, with respect to whether the memorandum addressed a matter of public concern. While evidence that would normally be classified as hearsay is nonetheless admissible to show a party's state of mind; *State* v. *Alvarez*, 216 Conn. 301, 311–12, 579 A.2d 515 (1990); a trial court may properly exclude it if its potential prejudicial impact outweighs its probative value. We have previously held that prejudice to a defendant could outweigh the probative value of relevant evidence, thereby warranting its exclusion, "where the proof and answering evidence it provokes [might] create a side issue that will unduly distract the jury from the main issues . . . ." (Internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 307, 664 A.2d 743 (1995); *State* v. *Greene*, 209 Conn. 458, 478, 551 A.2d 1231 (1988). In assessing the admissibility of potentially prejudicial evidence, the proper focus is not on the potential relevance of the evidence, "but [on] the impact of that which is extraneous." (Internal quotation marks omitted.) *State* v. *Woodson*, 227 Conn. 1, 17, 629 A.2d 386 (1993).

The record in this case indicates that the trial court properly scrutinized the prejudicial impact of the statements in question before ordering their redaction. The trial court recognized the statements' relevance with respect to whether "[Daley's] intent was primarily to address [her] personal concern or to address and champion the rights of other similarly situated people . . . ." It nonetheless concluded that "those two sentences are more prejudicial than probative" due to the collateral issues likely to arise upon their admission. The court explained its reasoning as follows: "The prejudice I would imagine is that [the defendants] don't agree that the two other people left [Aetna] because of inability to procure a flexible working arrangement. The desire

to do so in a period when Aetna was massively laying off people always brings I would imagine into any termination the issue of whether it was for flexible purposes or inability to get flexible time or for other reasons, brings in collateral issues."[8] Under these circumstances, we cannot say that the trial court abused its discretion in excluding from evidence the two sentences in Daley's memorandum that addressed the experiences of unidentified Aetna employees.

## IV

## JURY INSTRUCTIONS

We next address Daley's challenge to the trial court's instructions pertaining to her negligent misrepresentation claim. In its instructions, the trial court explained the nature of Daley's claim to be that "Aetna negligently represented to [her] that it was committed to helping its employees balance the demands of work and family and that it would support its employees in balancing their commitments by means of work and family programs including work-at-home options, part-time hours and flextime." In connection with its instructions on the burden of demonstrating that these representations were false, the trial court stated: "In other words, [Daley bears] the burden of establishing that Aetna was *not* committed to help its employees balance the demands of work and family and that it would *not* support its employees in balancing their commitment by means of work and family programs, including work-at-home

---

[8] In making its ruling, the trial court emphasized "other areas of the [memorandum] which one could interpret as addressing a general public concern as opposed to a private concern," and that the redaction did not preclude Daley from arguing her point. Daley therefore cannot establish, nor does she claim, that she was harmed by the redaction. In the absence of the requisite showing of harm, we decline to interfere with the trial court's evidentiary ruling. See *State* v. *Tatum*, 219 Conn. 721, 738, 595 A.2d 322 (1991) (requiring defendant to demonstrate harm of trial court's ruling to exclude evidence).

options, part-time options, and flextime." (Emphasis added.)

Daley contends that the trial court's charge imposed an impossible burden of proof by making it appear that she could not prevail if the jury found that Aetna had any commitment whatsoever to its work and family programs. According to Daley, because Aetna likely had *some* level of commitment to its programs, the charge prevented the jury from determining whether Aetna had been negligent in representing those programs. Daley argues that, in accordance with its proposed instructions, the trial court should have charged the jury that she could prevail upon a showing that Aetna was " 'not as committed' " to helping its employees " 'to the extent [that] it represented.' " Aetna, on the other hand, argues that the trial court's instructions adequately presented the case to the jury because, notwithstanding its flexible scheduling options, Aetna never represented to Daley that a work-at-home arrangement was an entitlement, nor that an employee who relentlessly pursued such an arrangement would not be discharged. In addition, Aetna argues that Daley's proposed instructions would have misled the jury to find Aetna liable without proving an actual misrepresentation. We agree with Aetna.

As noted above, we review the trial court's jury instructions to determine "whether the charge as a whole presents the case to the jury so that no injustice will be done." (Internal quotation marks omitted.) *Stewart* v. *Federated Dept. Stores, Inc.*, supra, 234 Conn. 603. Taking into account the factual issues presented at trial; see *State* v. *Austin*, supra, 244 Conn. 237; the court's instructions "must correctly adapt the law to the case in question and must provide the jury with sufficient guidance in reaching a correct verdict." *Stewart* v. *Federated Dept. Stores, Inc.*, supra, 603.

We first note that falsity is an essential element of a negligent misrepresentation claim, and that Daley bears

the burden of demonstrating that the defendants made certain representations regarding the availability of alternative scheduling arrangements that were in fact untrue. See, e.g., *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 57, 717 A.2d 724 (1998); *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 575, 657 A.2d 212 (1995). Daley need not prove that the representations made by the defendants were promissory, but only that they contained false information. *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 218, 520 A.2d 217 (1987). In connection with this count, the trial court explained that Daley had the burden of demonstrating that Aetna "was not committed" to helping its employees balance work and family demands, and "would not support" its employees in balancing those commitments through alternative work arrangements.

The following additional facts are relevant to the resolution of this issue. The gravamen of the defendants' alleged negligent misrepresentations, according to Daley, is that they represented a willingness to accommodate employee requests for alternative work schedules beyond the extent to which such requests were actually granted. At trial, however, Daley testified that she understood that requests for alternative scheduling policies would be granted at the supervisor's discretion in accordance with business needs and departmental workloads. This policy was clearly set forth in Aetna's "Employee Handbook of Personnel Policies and Programs." Daley testified further that the defendants never represented that alternative work arrangements were an entitlement.

In the context of the factual evidence raised in this case, the court's instruction that the defendants would be liable only if Daley successfully showed that Aetna was "not committed" to helping its employees balance

the demands of work and family, and that it did "not support" flexible scheduling options cannot be improper. The test is not one of linguistic exactitude; we demand only that the trial court's instructions "correctly adapt the law to the case," and "provide the jury with sufficient guidance in reaching a correct verdict." *Stewart* v. *Federated Dept. Stores, Inc.*, supra, 234 Conn. 603. Given Daley's express knowledge of the discretionary nature of Aetna's alternative scheduling options, it is logical to conclude that Daley could prevail on her negligent misrepresentation claim only to the extent that she successfully showed that Aetna in fact had provided no such option. The trial court's instructions in this case meet the applicable standard.

We reach the same conclusion with respect to Daley's challenge to the trial court's failure to instruct the jury that she could prevail upon a showing that the defendants had "failed to warn employees that the use of [Aetna's work and family] programs was entirely at the discretion of individual supervisors" and that their interest in such programs "might be held against them." As stated previously, Daley testified that she was familiar with the discretionary nature of Aetna's alternative scheduling policies. Furthermore, Daley presented no evidence at trial that the defendants falsely represented that they would *not* take disciplinary action against an employee who relentlessly pursued an alternative work schedule. Based on the evidence before it, therefore, the trial court's instructions were proper.

V

DEFAMATION

We next address Daley's assertion that, with respect to her common-law defamation claim, the trial court improperly failed to set forth independently in the verdict form submitted to the jury each of the allegedly defamatory statements made by Flynn. At trial, Daley

claimed that on nine separate occasions, Flynn had made defamatory remarks to her supervisors regarding Daley's job performance. As part of its charge to the jury, the court read each of Flynn's allegedly defamatory statements. The court declined Daley's request to individually set forth each statement in the verdict form, and instead submitted an interrogatory that asked whether "Flynn's statements . . . were statements of fact, rather than opinion." On appeal, Daley claims that only two of these statements could reasonably be construed as statements of opinion, and therefore, the jury's conclusion that none of the statements were statements of fact "clearly indicates confusion or other error."

We recognize that the trial court has broad discretion to regulate the manner in which interrogatories are presented to the jury, as well as their form and content. *Gaulton* v. *Reno Paint & Wallpaper Co.*, 177 Conn. 121, 125, 412 A.2d 311 (1979). We require only that the interrogatories provide a "means by which the jury may record the findings of fact which form the basis for their verdict." Id., 127. In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling. *State* v. *Weidenhof*, 205 Conn. 262, 278, 533 A.2d 545 (1987).

To prevail on a common-law defamation claim, a plaintiff must prove that the defendant published false statements about her that caused pecuniary harm. *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 27, 662 A.2d 89 (1995). To be actionable, the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion. See *Mr. Chow of New York* v. *Ste. Jour Azur S.A.*, 759 F.2d 219, 230 (2d Cir. 1985) (no liability where restaurant review conveyed author's opinion rather than literal fact); *Hotchner* v. *Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977) ("[a] writer cannot be sued for simply expressing his opinion of

another person, however unreasonable the opinion or vituperous the expressing of it may be").

In the present case, the jury was called upon to determine whether the statements made by Flynn regarding Daley's work performance constituted statements of opinion or fact. In its charge, the trial court read each of Flynn's allegedly defamatory statements to the jury. The court then explained that "[a] statement must be an expression of fact such as he is a thief. . . . [A] statement can not be an opinion such as I think he is a thief or a question such as is he a thief. Based on your recollection of the testimony, you must first determine if the remarks allegedly made by [Flynn] were statements."

We find no merit to Daley's claim that the interrogatory submitted to the jury was confusing. Contrary to her assertion, the verdict returned by the jury admits of no confusion, the quality of which would warrant reversal. See, e.g., *Hammond* v. *Waterbury*, 219 Conn. 569, 581, 594 A.2d 939 (1991) (interrogatory found confusing where jury was asked to consider legal principles not applicable to facts of case); *Norrie* v. *Heil Co.*, 203 Conn. 594, 604–605, 525 A.2d 1332 (1987) (assessing alleged jury confusion by examining logical consistency between answers to several interrogatories). In support of her assertion that the jury was confused by the interrogatory, Daley points only to the verdict that the jury had returned in favor of the defendants. Without more, there is no basis upon which to conclude that a jury verdict adverse to one party is confusing. Moreover, Daley's assertion that the jury was confused by the interrogatory is undermined by her failure to object to the adequacy of the court's charge. See *Gaulton* v. *Reno Paint & Wallpaper Co.*, supra, 177 Conn. 128 (finding no merit to claim that jury was confused by interrogatory where trial court provided adequate instructions regarding legal standard to be applied). Therefore, we reject

Daley's claim that the interrogatory in question was confusing.

## VI

## DIRECTED VERDICTS

Daley next argues that the trial court improperly directed a verdict for the defendants on her common-law claims of wrongful discharge and tortious interference with employment, and her statutory claim of negligent employment practices. We address each of these claims in turn, mindful that, in reviewing the trial court's action in directing a verdict, we must consider the evidence in the light most favorable to Daley. *Berry* v. *Loiseau*, 223 Conn. 786, 819–20, 614 A.2d 414 (1992). We will affirm the court's action in directing a verdict if, based on the evidence and inferences properly drawn therefrom, the jury could not reasonably and legally have reached any other conclusion. *Petyan* v. *Ellis*, 200 Conn. 243, 244, 510 A.2d 1337 (1986); *Pinto* v. *Spigner*, 163 Conn. 191, 192–93, 302 A.2d 266 (1972).

## A

## Wrongful Discharge

Daley asserts that the trial court improperly directed a verdict on her common-law wrongful discharge claim because she presented evidence at trial from which the jury reasonably could have found that her discharge had been in contravention of the important public policy that requires employers to provide flexible work schedules for working parents, and that prohibits employers from discriminating against individuals who pursue such arrangements. The defendants, on the other hand, argue that Daley was discharged for poor work performance, and that she presented no evidence from which the jury reasonably could have concluded that her discharge had been in violation of any public policy mandate. Therefore, the defendants claim, the trial court

correctly directed a verdict in their favor. We agree with the defendants that Daley presented no evidence that her discharge violated public policy, and, accordingly, we affirm the trial court's judgment.

In reviewing this claim we adhere to the principles set forth in *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980). In that case, we sanctioned a common-law cause of action for wrongful discharge in situations in which the reason for the discharge involved impropriety "derived from some important violation of public policy." Id., 475; see *Morris* v. *Hartford Courant Co.*, 200 Conn. 676, 679, 513 A.2d 66 (1986); *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 572, 479 A.2d 781 (1984). In doing so, we recognized a public policy limitation on the traditional employment at-will doctrine in an effort to balance the competing interests of employers and employees. *Antinerella* v. *Rioux*, 229 Conn. 479, 492, 642 A.2d 699 (1994). "In *Morris* v. *Hartford Courant Co.*, supra, 680, we recognized the inherent vagueness of the concept of public policy and the difficulty encountered when attempting to define precisely the contours of the public policy exception. In evaluating claims, [w]e look to see whether the plaintiff has . . . alleged that his discharge violated any explicit statutory or constitutional provision . . . or whether he alleged that his dismissal contravened any judicially conceived notion of public policy. . . . *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 580–81, 693 A.2d 293 (1997)." (Citations omitted; internal quotation marks omitted.) *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 76–77, , 700 A.2d 655 (1997).

At trial, by reference to a constitutional provision and several state statutes, Daley sought to establish that her discharge contravened two important public policies with respect to employer personnel decisions. First, she asserts that Connecticut recognizes an

important public policy not to discriminate against workers who choose to have and raise children, and that this important policy requires that employers establish family-friendly scheduling options. She claims that the right to have and raise children is grounded in the due process clause of the fourteenth amendment to the United States constitution,[9] and that failing to establish flexible work schedules to accommodate the demands of work and family offends the public policy dictated by that fundamental right. Daley further asserts that Connecticut recognizes an important public policy to encourage employment opportunities for women, and that the defendants contravened that policy by discharging her for having sought a flexible work schedule. She looks for additional support for her public policy argument in several employment and child welfare statutes, including two statutes of the Connecticut Family and Medical Leave Law,[10] the federal Family and Medi-

---

[9] Section 1 of the fourteenth amendment to the United States Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Daley does not rest her public policy argument on any provision of the Connecticut constitution.

[10] Daley relies in part on General Statutes (Rev. to 1999) § 31-51nn which provides: "Family and medical leave: Employment and benefits protection. (a) Any eligible employee who takes leave under section 31-51*ll* for the intended purpose of the leave shall be entitled on return from such leave (1) to be restored by the employer to the position of employment held by the employee when the leave commenced; (2) if the original position of employment is not available, to be restored to an equivalent position with equivalent employment benefits, pay and other terms and conditions of employment; or (3) in the case of a medical leave, if the employee is medically unable to perform the employee's original job upon the expiration of such leave, to be transferred to work suitable to such employee's physical condition if such work is available.

"(b) The taking of leave under section 31-51*ll* shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced.

"(c) Nothing in this section shall be construed to entitle any restored employee to (1) the accrual of any seniority or employment benefits during any period of leave; or (2) any right, benefit or position of employment

cal Leave Act of 1993,[11] and General Statutes §§ 46a-

other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave.

"(d) As a condition of restoration under subsection (a) of this section for an employee who has taken leave under subdivision (4) of subsection (a) of section 31-51*ll*, the employer may have a uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work, except that nothing in this subsection shall supersede a valid law of this state or a collective bargaining agreement that governs the return to work of such employees.

"(e) Nothing in this section shall be construed to prohibit an employer from requiring an employee on leave under section 31-51*ll* to report periodically to the employer on the status and intention of the employee to return to work.

"(f) Employees may have additional rights under other state and federal law, including rights under the federal Americans with Disabilities Act of 1990. Nothing in sections 5-248a and 31-51kk to 31-51qq, inclusive, shall limit any such additional rights."

In addition, Daley relies in part on General Statutes § 31-55pp, which provides in relevant part: "Family and medical leave: Prohibited acts. (a) (1) It shall be a violation of sections 5-248a and 31-51kk to 31-51qq, inclusive, for any employer to interfere with, restrain or deny the exercise of, or the attempt to exercise, any right provided under said sections.

"(2) It shall be a violation of sections 5-248a and 31-51kk to 31-51qq, inclusive, for any employer to discharge or cause to be discharged, or in any other manner discriminate, against any individual for opposing any practice made unlawful by said sections or because such employee has exercised the rights afforded to such employee under said sections. . . ."

[11] Title 29 of the United States Code, § 2601, of the Family and Medical Leave Act of 1993 provides in relevant part: "Findings and Purposes

"(a) Findings

"Congress finds that—

"(1) the number of single-parent households and two-parent households in which the single parent or both parents work is increasing significantly;

"(2) it is important for the development of children and the family unit that fathers and mothers be able to participate in early childrearing and the care of family members who have serious health conditions;

"(3) the lack of employment policies to accommodate working parents can force individuals to choose between job security and parenting;

"(4) there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods;

"(5) due to the nature of the roles of men and women in our society, the primary responsibility for family caretaking often falls on women, and such responsibility affects the working lives of women more than it affects the working lives of men; and

60 (a) (7),[12] and 17a-101 (a).[13]

"(6) employment standards that apply to one gender only have serious potential for encouraging employers to discriminate against employees and applicants for employment who are of that gender.

"(b) Purposes

"It is the purpose of this Act—

"(1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity;

"(2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition;

"(3) to accomplish the purposes described in paragraphs (1) and (2) in a manner that accommodates the legitimate interests of employers;

"(4) to accomplish the purposes described in paragraphs (1) and (2) in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis; and

"(5) to promote the goal of equal employment opportunity for women and men, pursuant to such clause."

[12] General Statutes § 46a-60 provides in relevant part: "Discriminatory employment practices prohibited. (a) It shall be a discriminatory practice in violation of this section . . .

"(7) For an employer, by himself or his agent: (A) To terminate a woman's employment because of her pregnancy; (B) to refuse to grant to that employee a reasonable leave of absence for disability resulting from her pregnancy; (C) to deny to that employee, who is disabled as a result of pregnancy, any compensation to which she is entitled as a result of the accumulation of disability or leave benefits accrued pursuant to plans maintained by the employer; (D) to fail or refuse to reinstate the employee to her original job or to an equivalent position with equivalent pay and accumulated seniority, retirement, fringe benefits and other service credits upon her signifying her intent to return unless, in the case of a private employer, the employer's circumstances have so changed as to make it impossible or unreasonable to do so; (E) to fail or refuse to make a reasonable effort to transfer a pregnant employee to any suitable temporary position which may be available in any case in which an employee gives written notice of her pregnancy to her employer and the employer or pregnant employee reasonably believes that continued employment in the position held by the pregnant employee may cause injury to the employee or fetus . . . ."

[13] General Statutes § 17a-101 provides in relevant part: "Protection of children from abuse. Mandated reporters. Training program for identification and reporting of child abuse and neglect. (a) The public policy of this state

To varying degrees, each of these statutes regulates workplace conduct. Specifically, the Connecticut Family and Medical Leave Law allows employees up to sixteen weeks of unpaid leave for the birth of a child and proscribes retaliation for requesting leave. See General Statutes §§ 31-51nn through 31-51pp. The federal Family and Medical Leave Act of 1993, which is intended "to balance the demands of the workplace with the needs of families," provides for similar benefits. See 29 U.S.C. § 2601 (b) (1). Section 46a-60 (a) (7) provides a wide range of protections for pregnant women who wish to continue working during pregnancy and maintain their jobs and benefits thereafter. That statute prohibits an employer from terminating a woman's employment "because of her pregnancy" or from refusing to grant a "reasonable leave of absence for disability resulting from her pregnancy . . . ." General Statutes § 46a-60 (a) (7). Finally, § 17a-101 (a) establishes an important public policy to "protect children whose health and welfare may be adversely affected through injury and neglect," and sets forth the child abuse reporting and investigation obligations of certain health care professionals. None of these statutes requires that an employer accommodate employee requests for flexible work schedules.

In assessing Daley's claim that these statutes give rise to a clear public policy mandate in favor of family-friendly workplace policies, we note that the public policy exception to the at-will employment doctrine is a narrow one, and that we do not "lightly intervene to impair the exercise of managerial discretion or to

___

is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed to such child and family. . . ."

foment unwarranted litigation. *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 477." (Internal quotation marks omitted.) *Parsons* v. *United Technologies Corp.*, supra, 243 Conn. 79. Absent unusual circumstances, we will interfere with a personnel decision only if it implicates an explicit statutory or constitutional provision, or judicially conceived notion of public policy. See, e.g., id., 80 (employee wrongfully discharged for refusing to work under conditions which fall short of employer's obligation to provide safe place of employment); *Antinerella* v. *Rioux*, supra, 229 Conn. 493 (process server's discharge violates public policy when prompted by employer's interest in entering statutorily proscribed fee splitting agreement with third party); *Morris* v. *Hartford Courant Co.*, supra, 200 Conn. 680 (false accusation of criminal conduct is not demonstrably improper reason for dismissal where employer is not statutorily obligated to investigate veracity of allegation); *Sheets v. Teddy's Frosted Foods, Inc.*, supra, 480 (employee wrongfully terminated for insisting that employer comply with Connecticut Uniform Food, Drug and Cosmetic Act [then General Statutes §§ 19-211 through 19-239]).

Daley makes no claim that her discharge contravened an explicit statutory or constitutional provision, or a judicially conceived notion of public policy. She acknowledged both at trial and in her brief that she "was not treated as she was by her supervisor simply because she had a child," and that the defendants "did not necessarily violate any public policy in denying her request for a flexible work arrangement . . . ." Moreover, Daley recognized in her memorandum to Compton that "Aetna consistently does a good job . . . meeting the requirements of the Connecticut Family [and Medical] Leave Law . . . ." Finally, she presented no evidence that § 17a-101 (a) was intended to regulate workplace policies beyond the reporting requirements

of certain health care professionals. Although Daley alleges that her discharge contravened "the 'aim of civil rights laws . . . to free women from the shackles of outworn prejudices,' " she has not established that her discharge contravened an explicit statutory or constitutional provision, or judicially conceived notion of public policy.

We recognize the important public policy embodied in the express provisions of the Connecticut Family and Medical Leave Law, the federal Family and Medical Leave Act of 1993, and §§ 46a-60 (a) (7) and 17a-101 (a), and underscore every employer's duty to comply with those provisions. None of these statutes, however, expressly obligates an employer to accommodate an employee's work-at-home requests, or to refrain from taking adverse action against an employee who persists in her efforts to secure such an arrangement. In declining to recognize an important public policy to that effect, we are mindful that we should not ignore the statement of public policy that is represented by a relevant statute. *Sheets v. Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 480. Nor should we impute a statement of public policy beyond that which is represented. To do so would subject the employer who maintains compliance with express statutory obligations to unwarranted litigation for failure to comply with a heretofore unrecognized public policy mandate. See *Antinerella v. Rioux*, supra, 229 Conn. 492 (absent clear breach of public policy, "[t]he employer must be allowed to make personnel decisions without fear of incurring civil liability"). Accordingly, we affirm the judgment in favor of the defendants on the claim of wrongful discharge.

B

Tortious Interference with Employment

We next address Daley's assertion that the trial court improperly directed a verdict in favor of Flynn on the

claim of tortious interference with employment. Specifically, Daley claims to have presented evidence from which the jury reasonably could have concluded that Flynn had been motivated by retaliatory animus in initiating formal disciplinary proceedings against her and in subsequently recommending her discharge. According to Daley, therefore, Flynn acted outside the legitimate scope of her duties to engage in conduct that interfered with Daley's employment relationship with Aetna. Flynn, on the other hand, claims that Daley presented no evidence to support a finding that she maliciously interfered with Daley's employment relationship. On the contrary, Flynn claims that Daley's long-standing performance deficiencies justified the adverse personnel decisions taken against her. We agree with Flynn that Daley presented no evidence in support of her claim that Flynn was motivated by retaliatory animus. Nor did Daley present any evidence, as required to succeed on a claim for tortious interference, that her discipline and subsequent discharge was unjustified. We therefore affirm the trial court's directed verdict on Daley's claim of tortious interference with employment.

"This court has long recognized a cause of action for tortious interference with contract rights or other business relations. . . . Blake v. Levy, 191 Conn. 257, 260, 464 A.2d 52 (1983). . . . [We have held, however, that] not every act that disturbs a contract or business expectancy is actionable. Jones v. O'Connell, [189 Conn. 648, 660–61, 458 A.2d 355 (1983)]. Blake v. Levy, supra, 260–61. [F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . . [Blake v. Levy, supra], 261, quoting Kecko Piping Co. v. Monroe, 172

Conn. 197, 201–202, 374 A.2d 179 (1977). [A]n action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper means. . . . *Blake* v. *Levy*, supra, 262; *Kakadelis* v. *DeFabritis*, 191 Conn. 276, 279–80, 464 A.2d 57 (1983); see also *Sportsmen's Boating Corporation* v. *Hensley*, 192 Conn. 747, 753, 755, 474 A.2d 780 (1984) (liability in tort imposed only if defendant acted maliciously)." (Citation omitted; internal quotation marks omitted.) *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, 208 Conn. 525, 535–36, 546 A.2d 216 (1988). The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but " 'intentional interference without justification.' " 4 Restatement (Second), Torts § 766, comment (s) (1979). In other words, the employee bears the burden of alleging and proving " 'lack of justification' " on the part of the actor. Id.

This court has not had occasion to address whether these same principles apply when a claim for tortious interference is brought against an agent alleged to have interfered with or induced a principal to breach a contract between the principal and a third party. Assuming, arguendo, that a cause of action against an agent can lie for such interference with employment, Daley has failed to present evidence to support such a claim.

Daley makes no claim that her discharge was unjustified. Rather, at trial, she relied on the following facts to establish that Flynn was motivated only by a retaliatory animus: (1) a suggestion made by Flynn shortly after Daley drafted her memorandum to Compton, advising Daley to raise any employment related concerns with her "or someone at that appropriate level before going on to senior management"; (2) a statement made by Flynn, with respect to Daley's subsequent requests for an alternative work-at-home schedule, directing her

"don't ask again"; (3) Flynn's decision to place Daley on probation one week after she had taken a discretionary day from work; and (4) decisions made by Flynn, on two separate occasions, denying Daley's request for an alternative work-at-home schedule. This evidence, however, does not support an inference that Flynn was motivated by a retaliatory animus. Flynn's first three actions can be justified in their own right as a matter of employer prerogative. As to Flynn's decision to deny Daley's work-at-home request, Daley testified at trial that, given the circumstances surrounding Aetna's reorganization, she herself considered the denial reasonable. Moreover, Daley's own testimony established that Flynn had approved a $2100 raise for her after learning that she was pregnant, and had selected Daley as one of the few interior designers to remain with Aetna following the 1991 reorganization.

Daley's own testimony also undermined any inference that her discharge was unjustified. She admitted that her annual evaluations for the years 1989 to 1992 document long-standing performance deficiencies, including her inability to communicate effectively with supervisors and clients, her failure to complete projects on time, and her failure to display the level of commitment required to achieve increased project loads. She testified further that due to those performance deficiencies, Flynn had instituted formal disciplinary proceedings in March, 1992, eight months before Daley drafted her memorandum to Compton. In addition, Daley testified that despite having met weekly with Flynn to discuss strategies for improving her work performance, she continued to miss project deadlines and failed to update clients and colleagues on the status of ongoing projects. Accordingly, on October 23, 1992, four weeks before Daley had drafted her memorandum to Compton, Flynn placed her on a thirty day probation. On February 10, 1993, after Daley had neglected to submit

material orders necessary for the completion of three different work projects, Aetna terminated her employment.

We conclude that, based on the evidence before it, the jury could not reasonably and legally have concluded that Flynn, without justification, acted with retaliatory animus in instituting formal disciplinary proceedings against Daley, and subsequently in recommending her discharge, particularly in light of the fact that Daley herself testified to the performance deficiencies that served as a legitimate justification for the adverse employment action. Accordingly, we affirm the trial court's judgment on Daley's claim of tortious interference with employment.

C

Negligent Employment Practices

We next address Daley's assertion that the trial court improperly directed a verdict in favor of the defendants on her claim of unlawful working conditions pursuant to § 31-49.[14] Specifically, Daley claims that she presented evidence from which "the jury could have found that Aetna and [Flynn] failed to exercise reasonable care in the management and discipline of [Daley] or that Aetna failed in its duty to see that Flynn managed Daley in a fit and competent manner . . . ." We find no merit to Daley's claim and therefore affirm.

In *Parsons* v. *United Technologies Corp.*, supra, 243 Conn. 80, we specifically held that § 31-49 provides a cause of action to an employee who "is discharged for refusing to work under conditions that pose a substantial risk of death, disease or serious physical harm and that are not contemplated within the scope of the employee's duties." Daley herself recognizes in her brief, quoting *Parsons* v. *United Technologies Corp.*,

---

[14] See footnote 4 of this opinion.

supra, 80, that § 31-49 reflects " 'a broad legislative concern for the *physical* welfare and safety of Connecticut employees' "; (emphasis added); but she offers, however, no evidence that the conditions under which she labored at Aetna were physically hazardous. At best, Daley's claim misconstrues the scope of § 31-49; at worst, it borders on the frivolous.

The judgment is affirmed.

In this opinion the other justices concurred.