Kris JOHNSON

v.

Oswald SCHMITZ, et al.

No. 3:99CV1738 (JBA).

United States District Court,
D. Connecticut.

Sept. 29, 2000.

Daniel S. Blinn, Consumer Law Group, Rocky Hill, CT, for Kris Johnson, plaintiff.

Patrick M. Noonan, Delaney, Zemetis, Donahue, Durham & Noonan, Guilford, CT, for Oswald Schmitz, defendant.

### RULING ON DEFENDANTS' MOTION TO DISMISS [DOC. # 21]

ARTERTON, District Judge.

### I. FACTUAL BACKGROUND

Assuming all the factual allegations in the complaint to be true, and drawing all inferences in favor of the plaintiff, the following represents the background of this case. Plaintiff Kris Johnson is a graduate student in the doctoral program at Yale University, in the School of Forestry and Environmental Studies. Upon his entrance into the program, he was assigned a committee of faculty advisors to assist him in the development of his dissertation. *See* Compl. ¶ 20. Defendant David Skelly is a member of this committee and defendant Oswald Schmitz is co-chair. *See id.* at ¶¶ 21, 50.

While working on a research project for Schmitz in the summer of 1995, Johnson developed the idea for his dissertation, based on the Trophic–Dynamic Theory of Redundancy (the Theory), and recorded his notes and other information about the Theory in a private journal. *See id.* at ¶ 25. During that time, Johnson discovered two other student workers reading his journal and later overheard them explaining its contents to Schmitz. *See id.* at ¶¶ 27–28. As a result of this incident, Johnson expressed hesitation when Schmitz requested that he explain his ideas. Johnson was told by Schmitz that in order to complete his dissertation and pass his qualifying exam, he would have to trust the faculty. *See id.* at ¶¶ 30–31. Johnson subsequently explained the Theory to Schmitz. *See id.* at ¶ 32. Schmitz thought highly of the Theory, and recommended that Johnson prepare a grant to obtain funding for further research.

Johnson expressed concern to Kristina Vogt, a Yale faculty member who was the other co-chair of his dissertation committee, that Schmitz would misappropriate his ideas; Vogt assured him that this would not happen. *See id.* at ¶ 35. However, unbeknownst to Johnson, during that year Schmitz planned to take credit for the Theory and began steering his research in that direction. *See id.* at ¶ 44–45. As this was occurring, Johnson continued to work on his research, incorporating a novel technology called the Reaction Norm Approach into the Theory, and submitted a paper for publication in a well-known journal describing certain aspects of the theory. The Reaction Norm Approach was later appropriated by Skelly. *See id.* at ¶¶ 38, 66.

In mid-August 1996, Johnson took the written part of his doctoral qualifying exam, and was advised by Vogt that he had done very well. *See id.* at ¶ 48. In Fall 1996, Johnson appeared before the members of his "doctoral dissertation committee" for the oral part of his qualifying exam. During the exam, Johnson was aggressively criticized by Schmitz and Skelly in order to discourage him from pursuing

his ideas and to allow them to misappropriate the Theory. Johnson was told that his "thinking was flawed," "he could not see the big picture," and his ideas were "ridiculous and unoriginal." *See id.* at ¶¶ 50–54.

Following the exam, Schmitz told Johnson that he was relieving him of his ideas and subsequently, Schmitz and Skelly published Johnson's Theory and Reaction Norm Approach without attribution to Johnson. *See id.* at ¶¶ 57, 77. This publication precluded Johnson from pursuing further research on the Theory, as he was no longer able to obtain funding, and he was forced to abandon the Theory as his dissertation topic.

In January 1997, Vogt assured Johnson that she would stop Schmitz from further appropriating the Theory. However, afraid that she would not do so effectively, Johnson also submitted a formal letter to the Director of Doctoral Studies complaining of academic fraud. He did not receive a formal response, and in September, Yale stopped delivering his monthly salary supplement and his funding. *See id.* at ¶¶ 65, 71–72.

Johnson then wrote to the Dean of Yale School of Forestry and Environmental Studies who informed him that an Inquiry Committee would be formed. Five months later, the Committee informed Johnson that they had not found any reasonable grounds for believing his allegations of academic fraud. *See id.* at ¶¶ 79–80, 87. The investigation consisted of a keyword search to determine originality and did not include either intellectual analysis of Johnson' ideas, or personal interviews with plaintiff. *See id.* at ¶¶ 85, 88. Johnson appealed to the Provost who declined to reevaluate his claim. *See id.* at ¶¶ 94–95.

Defendants move to dismiss nine of plaintiff's remaining sixteen counts:[1] (5) breach of express contract against Yale;

(6) breach of implied contract against Yale; (7) breach of fiduciary duty against Schmitz, Skelly and Yale; (8) negligence against Schmitz and Skelly; (9) negligence against Yale; (11) defamation against Schmitz and Skelly; (12) defamation against Yale; (17) Unfair Trade Practices against Schmitz and Skelly; and (18) Unfair Trade Practices against Yale.

## II. LEGAL STANDARD

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) may be granted only "when it appears beyond doubt that there [is] no set of facts in support of plaintiff's claim which would entitle plaintiff to relief." *Harsco Corp. v. Segui*, 91 F.3d 337, 341 (2d Cir. 1996) (*citing Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "A complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." *Harsco Corp.*, 91 F.3d at 341 (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). When deciding a motion to dismiss, "the complaint is to be construed in the light most favorable to the plaintiff," and all the factual allegations in the complaint must be accepted as true. *Harsco Corp.*, 91 F.2d at 341. However, consideration is limited to the facts stated in the complaint and documents attached to the complaint as exhibits or incorporated by reference. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

## III. DISCUSSION

A. *Breach of Express and Implied Contracts by Yale (Counts Five and Six)*

Johnson's complaint alleges that Yale made specific express and implied contractual promises to him, and failed to deliver on these commitments. He claims that

---

1. Plaintiff has consented to the dismissal of civil theft claims, Counts Two and Three of the Amended Complaint. *See* Pl.'s Oppn. at 1, n. 1. Defendant has agreed to retract his motion to dismiss Count 4, Fraud, for lack of specificity, and allow plaintiff to amend the complaint to include the allegations set forth in plaintiff's opposition brief at page 6.

the express contract is based on distributed documents, including admissions literature and matriculation representations given to all doctoral students. The implied contract is founded on an alleged agreement by Yale to grant him all of the rights, privileges and protections to which Yale doctoral students are entitled in exchange for Johnson's agreement to become a graduate student. *See* Compl. ¶ 11.

In his opposition to the motion to dismiss, plaintiff outlines the specific contractual breaches claimed, although without delineation as to which promises are express and which are implied. Johnson's allegations include breaches of Yale's contractual duties to safeguard students from academic misconduct, to investigate and deal with charges of academic misconduct, and to address charges of academic misconduct in accordance with its own procedures. *See* Pl.'s Oppn. at 13. In addition, plaintiff claims that Yale violated the implied covenants of good faith and fair dealing inherent in each of these contracts. *See* Compl. ¶¶ 117, 120–121. Defendants, in return, argue that Johnson's contractual claims are not cognizable under Connecticut law. For the reasons discussed below, this Court disagrees.

 "[T]he basic legal relation between a student and a private university or college is contractual in nature." *Ross v. Creighton University,* 957 F.2d 410 (7th Cir.1992); *accord Zumbrun v. University of Southern California,* 25 Cal.App.3d 1, 10, 101 Cal.Rptr. 499 (1972); *Wickstrom v. North Idaho College,* 111 Idaho 450, 725 P.2d 155, 157 (1986); *CenCor, Inc. v. Tolman,* 868 P.2d 396, 398 (Colo.1994). "[T]here seems to be 'no dissent' from [the] proposition" that the "catalogues, bulletins, circulars, and regulations of the institution" determine the contractual relationship between the student and the educational institution. *Ross,* 957 F.2d at 416 (*quoting Wickstrom,* 725 P.2d at 157); *accord Zumbrun,* 25 Cal.App.3d at 10, 101 Cal.Rptr. 499; *CenCor, Inc.,* 868 P.2d at 398. "[A] court that is asked to enforce an

asserted 'contract' between a student and his university must examine the oral and written expressions of the parties in light of the policies and customs of the particular institution." *Banerjee v. Roberts,* 641 F.Supp. 1093, 1106 (D.Conn.1986). Because a student bases his or her decision to attend a college or university, in significant part, on the documents received concerning core matters, such as faculty, curriculum, requirements, costs, facilities and special programs, application of contract principles based on these documents and other express or implied promises, consistent with the limitations expressed in *Gupta v. New Britain General Hospital,* 239 Conn. 574, 687 A.2d 111 (1996), appears sound.

In *Gupta,* the Connecticut Supreme Court rejected the viability of a cause of action for breach of contract challenging the "overall quality of educational programs," concluding that such a general challenge implicates the same jurisprudential and policy considerations that led the courts to reject claims alleging the tort of educational malpractice, in which a student sues her academic institution for tortiously failing to provide adequate educational services or failing to diagnose educational impediments. *See* 239 Conn. at 590–91 & n. 15, 687 A.2d 111. The plaintiff in *Gupta* was a former medical resident who had been dismissed from his residency program due to his lack of academic abilities; he sued, alleging that any inadequacies on his part were due to a breach of the hospital's contractual obligations with him because it had "failed to provide him with a residency program that 'would reasonably and adequately train him' and that was 'in accordance with the standards recognized for teaching hospitals.'" *Id.* at 590, 687 A.2d 111.

The court found that " '[w]here the essence of the complaint is that [an educational institution] breached its agreement by failing to provide an effective education, the court is ... asked to evaluate the course of instruction [and] called

upon to review the soundness of the method of teaching that has been adopted by [that] educational institution.'" *Id.* (*quoting Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir.1992)). Because such a claim "in reality ... raises questions concerning the reasonableness of conduct by educational institutions in providing particular educational services to students," it must be answered with reference to standards of duty associated with the law of torts. *Id.* (citation and internal quotations omitted). From there, the court reasoned that the difficulty in applying tort principles that had led courts to reject claims of educational malpractice counseled against judicial interference in a "breach of contract claim based on inadequate educational services." *Id.* at 591, 687 A.2d 111.

The court pointed to a variety of reasons to support the conclusion that consideration of the adequacy of an academic program "is a project that the judiciary is ill equipped to undertake." *Id.* at 590, 687 A.2d 111. First, the court stated that questions about the reasonableness of an academic program "involve the judiciary in the awkward tasks of defining what constitutes a reasonable educational program and of deciding whether that standard has been breached." *Id.* at 591, 687 A.2d 111. Second, "[i]n entertaining such claims, courts are required 'not merely to make judgments as to the validity of broad educational policies ... but more importantly, to sit in review of the day-to-day implementation of these policies.'" *Id.* (*quoting Donohue v. Copiague Union Free Sch. Dist.*, 47 N.Y.2d 440, 445, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979)). Finally, the court stated that

> [j]udicial noninterference is especially appropriate in cases like the present one, in which the focus of a breach of contract claim is an allegedly inadequate residency program.... Specialized bodies, such as the accreditation council for graduate medical education (accreditation council), currently have the responsibility of overseeing and reg-

ulating residency programs, including the one offered by this hospital.... In light of the highly specialized nature of patient care, these external regulators are better suited than are courts to evaluate the effectiveness of a residency program.

*Id.* at 592, 687 A.2d 111 (citations omitted).

However, the court also emphasized that "[t]here are ... at least two situations wherein courts will entertain a cause of action for institutional breach of a contract for educational services." *Id.* First, if the claim alleged that the school had "failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field." *Id.* (*citing Wickstrom*, 111 Idaho 450, 725 P.2d 155) (action for breach of contract exists where plaintiff enrolled in course promising to train students to qualify as journeymen but failed to provide instruction on those skills). "The second would arise if the educational institution failed to fulfil a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Id.* (*citing CenCor, Inc.*, 868 P.2d at 399) (allowing breach of contract claim where defendant vocational school promised up-to-date equipment, computers, and word processing but failed to deliver).

More recently, in *Doe v. Yale Univ.*, 252 Conn. 641, 658–59, 748 A.2d 834 (2000), the Connecticut Supreme Court determined that *Gupta* did not preclude a cause of action brought by another medical resident against Yale based on allegations of negligent supervision and training resulting in physical injury. Although defendants urge the Court to read *Doe* as expressly limiting *Gupta* to permit a cause of action against an academic institution only where the plaintiff alleges that the breach by the institution relates to the traditional duty *not to cause physical harm, see* Def. Reply at 3 [Doc. # 26], a closer reading of the *Doe* case indicates that this interpretation cannot be sustained.

First, *Doe* was a negligence action alleging that the hospital's failure to adequately supervise and instruct Doe in proper medical technique negligently caused her to become exposed to the HIV virus, not a breach of contract claim. Thus *Doe* was concerned with distinguishing between impermissible educational malpractice claims rejected by *Gupta* and cognizable common law negligence claims arising in the educational context, and concluded that the distinction rested on the duty alleged to have been breached. *Id.* at 659, 748 A.2d 834. Because "[t]he duty that the plaintiff alleged was breached here is not some general duty to educate her effectively, as was the claim alleged in *Gupta*, [but rather that] in the course of instructing her, the defendant caused her to suffer physical injury as a result of its negligent conduct," the plaintiff in *Doe* stated a viable negligence claim. *Id.* at 660, 748 A.2d 834.

Second, the *Doe* court emphasized that although the jury in *Doe* had been asked to make determinations about the adequacy of some aspects of Yale's residency program and the training given to the plaintiff, which the court in *Gupta* had indicated was inappropriate for judicial review,

> [W]hat tips the balance here, however, and what distinguishes this case from *Gupta*, is the result of the claimed educational inadequacy. When the claimed result is an inadequate education, there is no viable claim because we are unwilling to recognize such a legal duty as a matter of public policy. When, however, the result is physical harm, as in the present sense, we are willing to recognize the claim because it falls within the traditionally recognized duty not to cause physical harm by negligent conduct. The fact that the harm is caused in an educational setting is not sufficient to remove the claim from that traditionally cognizable claim.

*Id.* at 663, 748 A.2d 834. Finally, the court also "caution[ed] . . . against placing undue weight on specific language of [*Gupta*'s]

proscription—for example, 'day-to-day implementation'—in order to suggest that an institution's conduct on any given day is immune from judicial scrutiny when that conduct causes physical harm." *Id.* at 662, 748 A.2d 834.

Johnson's claims against Schmitz, Skelly, and Yale, if cognizable, fall within the second *Gupta* exception for breach of a specific contractual promise distinct from a general, unactionable, promise to provide adequate education. The defendants argue that plaintiff's claims are simply educational malpractice claims in disguise, and characterize the plaintiff's claim as a breach of contract for failure "to provide an effective course or manner of education," challenging Yale's day-to-day practices and implementation of policies, "course of instruction," and "soundness of the method of teaching," as rejected in *Gupta*. Def.'s Mem. in Support at 11, 14. Defendants thus contend that under *Gupta* and *Doe*, Johnson's breach of contract claim cannot be sustained.

The Court disagrees. The facts of this case are distinct from those in *Gupta* and the other cases cited by the defendant finding no cause of action of a breach of contract claim sounding in educational malpractice. As discussed above, in *Gupta*, the plaintiff claimed that the hospital "failed to provide proper training facilities." 239 Conn. at 580, 687 A.2d 111. He also claimed that the hospital breached a contract with him by failing to attain the standards established for teaching hospitals. With respect to the first claim, the court determined that this was simply an allegation " 'that the education was not good enough.'" *Id.* at 593, 687 A.2d 111. With respect to the second claim, however, the court found that Gupta had failed to adduce any evidence in the trial court that the hospital had either lost its accreditation or that its accreditation was even in jeopardy, and decided that the defendant therefore was entitled to summary judgment on that claim. *See id.* Thus, *Gupta* supports this Court's determination that

Johnson's breach of contract claims against Schmitz, Skelly and Yale must await further factual development.

In the four consolidated *Mead School of Human Development* cases cited by the defendant, the plaintiffs argued that defendant Mead School promised to provide their children with individualized educational programs and had breached this promise by failing to either identify the students' academic strengths and weaknesses or meet the special needs of children with learning disabilities. *See Scalzi v. Mead School for Human Development*, No. X05CV 950148213S, 1999 WL 391917 at *8 (Conn.Super. June 4, 1999); *Fletcher v. Mead School for Human Development*, No. X05CV 960152138S, 1999 WL 391583 at *7 (Conn.Super. June 4, 1999); *Brodsky v. Mead School of Human Development*, No. DNX05CV 970156788S, 1999 WL 391580 at *6 (Conn.Super. June 4, 1999); *Tankoos v. Mead School for Human Development*, No. X05CV 950145853S, 1999 WL 391350 at *5 (Conn.Super. June 4, 1999) (consolidated). Applying *Gupta*, the court rejected these claims because the contractual promises alleged by the parents were too vague, and were indistinguishable from the overall obligation to offer a reasonable program. Significantly, the court found no allegation of a breach of any *specific* contractual duty to investigate whether the children had any learning disabilities, and refused to infer such a duty based only on their status as teachers. *See id.*

In contrast, where a breach of a specific, identifiable promise has been alleged, courts have found such a claim actionable. For example, in *Ross,* the court found that the plaintiff stated an actionable claim where, in exchange for his enrollment and participation on the basketball team, Ross alleged that the University had made an specific promise to provide adequate tutoring services, and had breached that promise by failing to provide any such services. *Ross,* 957 F.2d at 417. Similarly, in *Zumbrun,* where the university's catalogues

and bulletins had promised to offer the course 'Sociology 200,' including lectures and a final examination, its failure to provide either lectures or a final exam stated a claim for breach of contract. *Zumbrun,* 25 Cal.App.3d at 10–11, 101 Cal.Rptr. 499.

█ In the present case, Johnson does not claim that Schmitz, Skelly or Yale failed to "provide an effective manner or course of instruction." Def.'s Mem. in Support at 11. Instead, he claims that Yale failed to deliver on its express and implied contractual duties to safeguard students from academic misconduct, to investigate and deal with charges of academic misconduct, and to address charges of academic misconduct in accordance with its own procedures. *See* Pl.'s Oppn. at 13. These alleged promises are based on Yale's own representations and procedures related to conduct peripheral or ancillary to the central educational process. Thus, they do not implicate the jurisprudential considerations associated with the rejected tort of educational malpractice, as the Court or fact finder will not be required to evaluate subjective aspects of the quality of Yale's graduate academic program or otherwise make judgments on purely academic issues, but instead will determine whether or not Yale had a contractual duty to safeguard its students from faculty misconduct, and, if so, whether that duty was breached in Johnson's case.

In making this assessment, the Court recognizes that it may be required to evaluate the adequacy of policies designed to prevent misconduct; however, this factor is capable of objective assessment. Indeed, courts regularly engage in an analogous inquiry when, in resolving workplace sexual harassment cases, they evaluate an employer's affirmative defense that it had effective procedures in place to prevent the harassment. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 806–809, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72–73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (existence of anti-discrimination policy did

not insulate defendant from liability in part because its procedures did not encourage victims of harassment to report the incident). Moreover, *Doe* recognizes that courts and juries are competent to determine the adequacy of a school's safeguards in negligence context, and that the mere fact that the fact finder might be asked to consider the adequacy of a school's day-to-day operations will not necessarily insulate a school's actions from judicial review. *See Doe*, 252 Conn. at 662–63, 748 A.2d 834.

Because the plaintiff has alleged specific promises by Yale which, if supported by the evidence, are capable of objective assessment by the Court and therefore do not involve the Court in academic decision-making, defendant' motion to dismiss the breach of contract claim is DENIED.

## C. *Breach of Fiduciary Duty*

### 1. Claim against Yale.[2]

The plaintiff claims that since Yale was "in a position of power and authority" over him and "in a position of trust and confidentiality with regard to his education ideas and work product," Yale had a fiduciary duty toward him, Compl. ¶ 123, based on the "unique[ness]" of the particular relationship between a "graduate-level student and an educational institution." Pl.'s Oppn. at 16. He avers that as a student climbs the education ladder, the student-school relationship transforms. According to Johnson, because Yale graduate students are expected to develop their own research ideas and to supply funding for this research in the form of grants, under the sponsorship of professors, they are uniquely dependent on the University. Therefore, Yale's promise to its graduate students to provide a "nurturing environment," Compl. ¶ 19, is a basis for the conclusion that a fiduciary relationship may exist between Yale and Johnson.

A fiduciary relationship is "characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Dunham v. Dunham*, 204 Conn. 303, 320, 528 A.2d 1123 (1987) (a fiduciary relationship could be found to exist between brothers where the younger brother continually placed trust and confidence in the older brother, as an attorney, for legal and non-legal advice); *Alaimo v. Royer*, 188 Conn. 36, 37–41, 448 A.2d 207 (1982) (fiduciary relationship existed between plaintiff, 60 year old woman, and defendant who represented himself as knowledgeable real estate broker); *cf. Southbridge Associates v. Garofalo*, 53 Conn.App. 11, 18, 728 A.2d 1114 (1999) (no fiduciary relationship exists between mortgage lender and mortgagor borrower where bank had not become borrower's financial advisor). Accordingly, "[t]he fiduciary must act honestly, and with the finest and undivided loyalty[.]" *Konover Dev't Corp. v. Zeller*, 228 Conn. 206, 220, 635 A.2d 798 (1994).

The Connecticut Supreme Court has purposefully refrained from defining "a fiduciary relationship in precise detail and in such a manner as to exclude new situations." *Id.* at 320, 635 A.2d 798 (*quoting Harper v. Adametz*, 142 Conn. 218, 225, 113 A.2d 136 (1955)) (relationship between real estate agent who placed newspaper advertisement for sale of land and bidder could be defined as fiduciary); *accord Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 429 (2d Cir. 1999) (holding that jury could have found a fiduciary relationship between the Diocese and parishioner Martinelli based on priest's ties to plaintiff and Diocese's "knowledge and sponsorship" of that relationship).

Given the collaborative nature of the relationship between a graduate student and a dissertation advisor who neces-

---

**2.** Count 7 includes both the claim against Yale and the claim against Schmitz and Skel-

ly. Since the analyses of these claims are different, they are treated separately.

sarily shares the same academic interests, the Court can envision a situation in which a graduate school, knowing the nature of this relationship, may assume a fiduciary duty to the student. Yale allegedly represented that it would safeguard its students from faculty misconduct and provide a nurturing environment for its students. In light of the Connecticut Supreme Court's disinclination to confine the scope of the fiduciary duty doctrine by precise definition and its willingness to allow for case-by-case analysis in new situations, this Court concludes that greater factual development is required to determine whether such a relationship existed here. Plaintiff may further develop such factual issues as Yale's representation of its mission towards graduate students, and whether or not it represented that it would take care of graduate students to the exclusion of all others, which could be relevant to the determination of whether Yale owed a fiduciary duty to Johnson. Therefore, this analysis must await a full factual development at at least the summary judgment stage, and Yale's motion to dismiss is denied with respect to this Count.

### 2. Claim against Schmitz and Skelly.

■ The plaintiff claims that because Schmitz and Skelly were in a "position of power and authority" over Johnson, their relationship with him was of a fiduciary nature. *See* Compl. ¶ 123. Professors Schmitz and Skelly held such a position because they were assigned to serve on his dissertation advisory committee, whose sole purpose was to "assist Johnson in the development and completion of his dissertation." *See id.* at ¶¶ 20–21.

Upon further factual development, plaintiff may be able to show that the high degree of trust and confidence he placed in his professors was justified. His relationship with Schmitz and Skelly was personal and individualized, and as his advisors, they had some duty to protect his interests. Accordingly, this relationship appears somewhat analogous to the attorney-client relationship, because the members of his committee were not entitled to act for their own benefit. Further, Schmitz allegedly encouraged Johnson to trust him in sharing his dissertation ideas, and stated that failure to do so would be detrimental to Johnson's academic prospects. *See* Compl. ¶ 31. This act of encouragement is relevant to the consideration whether a fiduciary relationship was created here. *See Alaimo,* 188 Conn. at 37, 448 A.2d 207 (fiduciary relationship existed where defendant real estate broker encouraged plaintiff to trust him and assured her that he was experienced).

Therefore, for the reasons this Court concludes that Johnson might be able to establish that he has a fiduciary relationship with Yale, he may similarly be able to demonstrate a factual predicate for a fiduciary relationship with Schmitz and Skelly. The plaintiff alleges that the fiduciary duty was breached because Skelly and Schmitz, *inter alia,* misappropriated his ideas. If he can prove the existence of such a duty and the breach, the burden would then shift to Skelly and Schmitz to prove fair dealing by clear and convincing evidence. *Dunham,* 204 Conn. 303, 323, 528 A.2d 1123 (1987).

For these reasons, defendant's motion to dismiss the breach of fiduciary duty count against Schmitz and Skelly is DENIED.

### C. *Negligence*

### 1. Claim against Yale.

Plaintiff claims that Yale was negligent as to its duty to "establish and enforce reasonable rules, policies and guidelines to ensure that the ideas, data, research projects, information and career opportunities were not usurped, misappropriated, or plagiarized by members of the Yale faculty," and as to its duty to "establish and enforce reasonable measures to ensure that he was not repeatedly harassed ... embarrassed, defrauded, slandered and intimidated ... by the faculty." Compl. ¶ 129. Johnson alleges that this duty was

breached because the codes were inadequate and unenforced, and that he has been injured as a result.[3] Compl. ¶ 130.

"Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of a duty, and the specific persons to whom it is owed are determined by the circumstances surrounding the conduct of the individual ... The determination of whether a duty exists ... is a question of law." *Lodge v. Arett Sales Corp.*, 246 Conn. 563, 571, 717 A.2d 215 (1998). The Connecticut Supreme Court has stated that

> the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case.

*Id.* at 572, 717 A.2d 215; *see also RK Constructors v. Fusco Corp.*, 231 Conn. 381, 386–87, 650 A.2d 153 (1994).

The defendants in the present case argue that the plaintiff's negligence claim against Yale is barred by *Gupta* because accepting the plaintiff's claim would require the Court to "make judgments about the validity of broad educational policies and sit in review of the day-to-day implementation of these policies." Def.'s Reply at 6. To support this proposition, the defendants cite *Scalzi*, 1999 WL 391917 at *2–4, *Fletcher*, 1999 WL 391583 at *2–4, *Brodsky*, 1999 WL 391580 at *2–4, *Tankoos*, 1999 WL 391350 at *2–4. In these cases, as previously discussed, the plaintiff's claimed that Mead School breached

its duty to educate, identify learning disabilities, and provide specialized training. *See id.* Here, the plaintiff's claims are distinguishable. He does not claim a duty to educate, but to establish and enforce reasonable rules. As previously concluded in the context of plaintiff's breach of contract claim, this is a sphere which the judicial system is capable of assessing.

The defendant further argues that *Doe* rejects, as a matter of public policy, the existence of a duty to "establish and enforce reasonable rules." Def.'s Reply at 5. Instead, defendant asserts, the only negligence claim that the Connecticut Supreme Court recognizes in the educational setting is "the duty not to cause physical harm by negligent conduct." *Id.* Again, the Court disagrees with this characterization of *Doe*. As discussed previously, in *Doe*, the Connecticut Supreme court rejected the proposition that the common law duty of care "disappear[s] when the negligent conduct occurs in an educational setting." *Doe*, 252 Conn. at 659, 748 A.2d 834. The court reasoned that the distinction between an educational malpractice claim and a cognizable negligence claim occurring in a educational setting, "lies in the duty alleged to have been breached. If the duty alleged to have been breached is the duty to educate effectively, the claim is not cognizable. If the duty alleged to have been breached is the common law duty not to cause physical injury by negligent conduct, such a claim is, of course, cognizable." *Id.* (citation omitted). Because the duty alleged to be breached is the duty to establish and enforce reasonable rules, this Court is not precluded by *Doe* from hearing the claim.

Having determined that the plaintiff's claim is not barred by *Doe* or *Gupta*, it is necessary to apply the test formulated by the Connecticut Supreme Court for determining whether Yale owed Johnson a legal duty of reasonable care. The first

---

3. Although Johnson does not specify exactly what kind of injury he suffered, it can be inferred that the injury was economic harm, including loss of career opportunities, and emotional distress, caused by the "harass[ment]" and "embarass[ment]" he allegedly suffered.

consideration is whether the harm suffered by Johnson was foreseeable by Yale. It is important to note that "the exact nature of the harm suffered need not have been foreseeable, only the 'general nature' of the harm." *Lodge*, 246 Conn. at 573, 717 A.2d 215. In *Van Eck v. MBNA America Bank, NA*, No. 434282, 1999 WL 810245, 1999 Lexis 2636 at *1–2 (Conn.Super. Sept. 29, 1999), the plaintiff alleged that the defendant was negligent in failing to supervise its employees when, in trying to collect a credit card debt, they repeatedly harassed the plaintiff over the telephone. *Id.* at *14. The court held that since the employees' conduct was "extreme and outrageous," the defendant knew or should have known that the plaintiff would suffer emotional distress. *Id.* Similarly, if, as Johnson alleges, Yale's rules for protecting its students were inadequate or if Yale failed to enforce them adequately to protect him, it is foreseeable that one of its graduate students could suffer emotional distress and economic harm.

The second prong of the test calls for a public policy analysis. " '[D]uty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *RK Constructors*, 231 Conn. at 386, 650 A.2d 153. Therefore, liability may be properly imposed on defendants if, and only if, doing so would serve a "legitimate objective of the law." *Id.* at 381, 650 A.2d 153. In engaging in public policy analysis, "the measure of attenuation between [the defendant's] conduct, on the one hand, and the consequences to and the identity of the plaintiff, on the other hand" is relevant. *RK Constructors*, 231 Conn. at 387, 650 A.2d 153.

In *RK Constructors*, the defendant negligently injured one of the plaintiff's workers. *Id.* at 382, 650 A.2d 153. Plaintiff brought suit claiming that defendant's negligence in causing injury to one of the plaintiff's employees increased its insurance premiums. *Id.* The court found that although it may have been foreseeable that if plaintiff's employee were injured its insurance premiums would increase, the nexus between the defendant's conduct and the consequences and identity of the plaintiff was too tenuous to support the imposition of a legal duty.

Here, in contrast, the nexus is not tenuous at all. Plaintiff alleges that Yale negligently failed to protect him against faculty misconduct, which caused him to be injured by faculty wrongdoing. In addition, a legitimate legal objective would be served by finding a duty. An important function of the tort system is the " 'prophylactic' factor of preventing future harm." *Lodge*, 246 Conn. at 579, 717 A.2d 215. Universities are in the best position to prevent this kind of faculty misconduct in the future. Accordingly, as the existence of a duty of care could be shown, and plaintiff has alleged that he was injured by a breach of this duty, defendants' motion to dismiss the negligence count against Yale is denied.

### 2. Claim against Schmitz and Skelly.

█ Plaintiff alleges that Schmitz and Skelly breached a duty of care owed to Johnson by misappropriating Johnson's idea, after encouraging him to trust them, promising to use the information Johnson disclosed about his Theory for his benefit, and encouraging him to use the Yale laboratory and apply for research grants. These actions, it is asserted, were done without due concern for the consequences and harm that they might, and did, cause Johnson. *See* Compl. ¶¶ 126–127.

In response, defendant argues that the negligence claim comes within the educational malpractice exclusion. As previously discussed, Johnson is not claiming that Schmitz and Skelly breached a duty to educate him effectively. Thus, this claim is not barred by *Gupta.*

Defendants further argue that because the alleged wrongful conduct engaged in by Schmitz and Skelly was intentional, it

cannot support a negligence claim. Specifically, they point to plaintiff' statement that "this case is about alleged plagiarism of Johnson's original dissertation topic by Yale faculty members ...". Pl.'s Oppn. at 9. The plaintiff concedes that this claim is somewhat inconsistent with his other allegations; however, he maintains that this is a pleading in the alternative. "Under our pleading practice, a plaintiff is permitted to advance alterative and even inconsistent theories of liability against one or more defendants in a single complaint." *Dreier v. Upjohn Co.,* 196 Conn. 242, 245, 492 A.2d 164 (1985); *accord Hanover Insurance co. v. Fireman's Fund Insurance Co.,* 217 Conn. 340, 346, 586 A.2d 567 (1991) (absent a showing of prejudice, inconsistent pleadings are not prohibited). Since there is nothing to suggest that defendants are prejudiced by plaintiff's alternate pleading, the motion to dismiss Count 8 is DENIED.

### D. *Defamation*

1. Claim against Schmitz and Skelly.

The plaintiff alleges that during his oral qualifying examination, Schmitz and Skelly made false statements, known to be false, that injured him. *See* Compl. ¶¶ 137–139. Specifically, plaintiff claims that Schmitz and Skelly stated that "he could not see the 'big picture,' that his thinking was flawed, and his idea ridiculous and unoriginal." *See* Compl. ¶ 52. In addition, after the exam, Schmitz allegedly told Johnson that "he did not have what it took to write a thesis and be awarded a Ph.D." *See* Compl. ¶ 53.

To prevail on a defamation claim, the plaintiff must show that "the defendant published false statements about her that caused pecuniary harm." *Daley v. Aetna Life & Casualty Co.,* 249 Conn. 766, 796, 734 A.2d 112 (1999). Further, a defamatory statement must convey an objective fact, since expressions of mere opinion are generally not actionable. *Id.* "[W]hile this distinction may be somewhat

nebulous, ... the important point is whether ordinary persons hearing ... the matter complained of would be likely to understand it as an expression of the speaker's opinion, or as a statement of existing fact." *Goodrich v. Waterbury Republican–American, Inc.,* 188 Conn. 107, 111–112, 448 A.2d 1317 (1982). In making this determination, a court may consider (1) the context and circumstances (2) the language used, and (3) whether the statement is objectively capable of being proved true or false. *See Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 226 (2d Cir.1985) (holding that defendant's restaurant review was opinion, based on context of statements and reasoning that statements about "temperature," "thickness," and "quality" were matters of personal taste); *Scandura v. Friendly Ice Cream Corp.,* No. CV 93–0529109, 1994 WL 363370 at *1 (Conn.Super. Jul. 5, 1994) (statement that plaintiff employee was "in over her head" and not "a manager of the 90s" is opinion). Moreover, the law protects even exaggerated or hyperbolic language of opinion. *See Mr. Chow of New York,* 759 F.2d at 229 (readers of restaurant review would not take literally statements such as "the green peppers ... remained still frozen on the plate.")

In arguing that the statements plaintiff highlights as defamatory are merely expressions of opinion, the defendants point to cases in which employee work performances were criticized. The statements made in these cases were not capable of being proved true or false, and therefore could not be defamatory. *See Perruccio v. Arseneault,* 7 Conn.App. 389, 393–94, 508 A.2d 831 (1986) (holding statement accusing plaintiff of "dictator leadership" is a statement of opinion); *Torok v. Proof,* No. CV 90–0113204, 1993 WL 28878 (Conn.Super. Feb.1, 1993) (holding statement that plaintiff was "not a good accountant" is a matter of opinion).

This analogy is persuasive. While the Court can imagine a situation in which a statement regarding the originality of

ideas could be factual,[4] in this case, the defendants' statements were merely expressions of opinion. The assertions were made during an academic evaluation of plaintiff's work to other members of the faculty. In the context of such an evaluation, an ordinary person "would be likely to understand [the comments as] an expression of the speaker's opinion," including the statement that plaintiff's ideas were "ridiculous and unoriginal."

In response, the plaintiff argues that the exception established by the Second Circuit in *Hotchner v. Castillo–Puche*, 551 F.2d 910 (2d Cir.1977), provides a basis for his defamation claim. There, the court held that a statement of opinion based on "false fact" could be actionable where the defendant had made opinion statements impliedly based on a non-existent personal relationship with the plaintiff. *See id.* at 913. At oral argument, the plaintiff in the present case asserted that the *Hotchner* exception applies because neither Schmitz nor Skelly actually believed the truth of the criticisms they made of Johnson. This explanation, however, does not provide a *factual* basis on which defendants' statements are based, rather, it asserts that defendants were being untruthful about their opinions. Since the rendering of a false opinion is not actionable under defamation law, defendants' motion to dismiss is granted with respect to Counts 11 and 12.[5]

### E. *Connecticut Unfair Trade Practices Act*

In the Seventeenth and Eighteenth Counts, plaintiff alleges that defendants' conduct violated CUTPA. CUTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b (West 2000). "Trade or commerce" is defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn.Gen.Stat. § 42–110a (West 2000). The Act "must be liberally construed in favor of those whom the legislature intended to benefit." *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 492, 656 A.2d 1009 (1995) (quoting *Concept Associates, Ltd. v. Board of Tax Review*, 229 Conn. 618, 623, 642 A.2d 1186) (1994).

Plaintiff alleges that Schmitz and Skelly induced him to divulge his ideas, misappropriated his Theory, and raised false and disingenuous criticisms about him and his work in order to advance their claim to the theory. *See* Compl. ¶¶ 160–61. Additionally, he asserts that Yale, *inter alia*, withheld funding and research grants, denied him access to Yale's laboratory, and conducted a "white wash" investigation of his complaint of misconduct. Compl. ¶ 70. These actions are the deceptive or unfair practices on which Johnson relies for his CUTPA claim.

To support the claim that these actions were taken "in the conduct of a trade or commerce," plaintiff makes the following allegations. Schmitz and Skelly misappropriated his ideas so that they could research Johnson's ideas and publish them as their own. *See* Compl. ¶ 159. During the 1995–1996 academic year, Schmitz began to graft data from his own experiments onto Johnson's Theory, *see id.* at ¶¶ 44–45, and later informed Johnson that he would no longer allow overlap between his work and Johnson. *See* Compl. ¶ 57. Skelly adopted Johnson's Reaction Norm approach in his own research and took credit for the technique. *See* Compl. ¶¶ 66–67. Although Johnson requested that

---

4. For example, courts are called upon to judge originality in patent and copyright cases.

5. Count Twelve charges Yale with defamation under a theory of respondeat superior. Since it does not allege any other statements that may be defamatory, this Count cannot stand.

the director of doctoral studies prevent Schmitz and any collaborators from publishing his ideas, *see* Compl. ¶ 63, Schmitz and Skelly continued to publish plaintiff's ideas and use them to obtain grants in order to advance their own research and careers, including their standing for tenure. *See* Compl. ¶ 77. In addition, Johnson claims that Yale's conduct facilitated the professors' theft of his ideas. For example, he asserts that Yale withheld grant money from him to prevent him from pursuing his research on the ideas that Schmitz and Skelly had falsely claimed as their own. *See* Compl. ¶¶ 72, 83.

From the foregoing review of plaintiff's contentions, the Court concludes that the claimed misconduct by Schmitz, Skelly and Yale was executed in the context of academic research and publication. At oral argument, plaintiff conceded that the defendants were not motivated directly by financial incentives. Instead, the driving forces behind the professors' conduct were professional prestige and stature resulting from publishing the Theory, *see* Compl. ¶ 58, and the desire to obtain tenure. *See* Compl. ¶ 59. The issue is therefore whether CUTPA was intended to reach unfair and deceptive acts committed in the conduct of academic research and publication.

At first glance, a university looks fundamentally different from other contexts to which CUTPA has been applied, such as consumers of products or business competitors. In the words of John Henry Cardinal Newman, a university "is a place where inquiry is pushed forward, and discoveries verified and perfected, and rashness rendered innocuous, and error exposed, by the collision of mind with mind, and knowledge with knowledge." *Quoted in* Andrew L. Anderson, "Ex Corde Ecclesiae: Obstacle or Opportunity for Catholic Affiliated Law Schools," 34 *Gonz.L.Rev.* 103, 107 (1999). In addition to the transmission of knowledge undertaken in the classroom, Cardinal Newman envisioned an academic environment in which "a multitude" of students would " 'come together and freely mix with each other, where they are sure to learn from one another even if there be no one to teach them.'" Sheldon E. Steinbach, *Katuria E. Smith v. The University of Washington Law School*, 26 J.C. & U.L. 467, 470–71 (2000).

However, the climate of educational institutions is changing. Nearly every research university now has a Technology–Licensing Office to commercialize discoveries made by its professors. *See* Eyal Press & Jennifer Washburn, "The Kept University," *The Atlantic Monthly*, Mar. 2000 at 39. Last year, for example, the Stanford technology-licensing office collected $61 million for the University. *See id.* In addition, universities increasingly enter into contracts with large companies to gain funding for their work in exchange for the rights to that research. *See id.*

Courts have reached differing results with respect to unfair trade practices claims in the educational context. The Supreme Judicial Court of Massachusetts makes a distinction between activities in furtherance of a charitable institution's core mission and those done in a business context. *See Linkage Corp. v. Trustees of Boston University*, 425 Mass. 1, 26, 679 N.E.2d 191 (1997); *accord Thornton v. Harvard University*, 2 F.Supp.2d 89, 95 (1998). In determining whether or not a particular endeavor falls within the business context and is, therefore, "trade or commerce," the relevant factors are the institution's motivations, the nature of the transaction, and the activities of the parties. *See Linkage Corp.*, 425 Mass. at 26, 679 N.E.2d 191. Under that framework, the *Linkage Corp.* court held that Boston University, in forming a contract with Linkage Corporation to create and provide technical training programs, was engaged in trade or commerce. *See id.* at 2, 26, 679 N.E.2d 191. In contrast, applying the same standard, the court in *Thornton* found that a university's administration of student financial aid was in furtherance of

its core mission, and therefore, did not involve the institution in trade or commerce. *See Thornton*, 2 F.Supp.2d at 95.

The Third Circuit has taken a different approach to analyzing a university's activities under the Sherman Anti–Trust Act. In *United States v. Brown Univ.*, 5 F.3d 658 (3d Cir.1993), the court held that an organization formed by eight universities to collectively determine the amount of financial assistance to award to students was in violation of the Act. *See id.* at 661. In ascertaining the nature of the universities' conduct, the court opined that "the payment of tuition in return for educational services constitutes commerce." *Id.*

To resolve the present action, this Court need not decide to what extent an educational institution's activities may fall within the scope of CUTPA because it concludes that actions taken in the conduct of academic research and publication are not within the intendment of the statute. Cases involving CUTPA claims in the context of the legal and medical professions are instructive.

In reviewing an alleged Sherman Act violation, the Supreme Court observed that "it would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 786 n. 15, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). The Connecticut Supreme Court has endorsed this view in resolving CUTPA claims against a hospital and a physician. *See Haynes v. Yale–New Haven Hospital*, 243 Conn. 17, 36–38, 699 A.2d 964 (1997). "We do not consider the [legislature's] use of 'trade or commerce' in defining the application of the act to exhibit an intent to include the actual performance of medical services or the actual practice of medicine." *Nelson v. Ho*, 222

Mich.App. 74, 564 N.W.2d 482, 486 (1997) (*quoted in Haynes*, 243 Conn. at 37, 699 A.2d 964 ("We find these decisions persuasive and conclude that their reasoning is equally applicable to CUTPA claims.")).

Attorneys receive similar treatment under CUTPA. The Connecticut Supreme Court has held that "[t]he noncommercial aspects of lawyering—that is, the representation of the client in a legal capacity—should be excluded [from CUTPA] for public policy reasons." *Haynes*, 243 Conn. at 35, 699 A.2d 964. Instead, CUTPA covers only the entrepreneurial or commercial aspects of the professions of law and medicine, such as solicitation of business and billing practices. *See Haynes*, 243 Conn. at 33, 35–36, 699 A.2d 964 (*citing Ikuno v. Yip*, 912 F.2d 306, 312 (9th Cir. 1990)).

The work of a university professor is analogous to that of attorneys and doctors, and research and publication are at the heart of that work. In the present case, these activities do not pertain to an entrepreneurial or commercial aspect of Yale's doctoral program. Schmitz and Skelly's alleged misconduct, the misappropriation of Johnson's ideas for use in their own research and publications, were not motivated by financial considerations. Instead, they allegedly sought recognition and tenure. Although tenure obviously implicates financial concerns indirectly, it mainly serves as "the glove that protects its hand, freedom of speech and freedom of inquiry within the academic setting." Dr. Robert B. Conrad and Dr. Louis A. Trosch, "Renewable Tenure," 27 *J.L. & Educ.* 551 (1998). This type of academic work, which is not conducted for financial gain, is not the kind of "trade or commerce" that the legislature intended to reach with CUTPA. Yale's actions merely facilitated the professors' alleged misconduct in obtaining the ideas for further research and publication.[6]

---

**6.** Although the plaintiff avouches that Yale's reputation was improved as a result of the alleged misappropriation of the theory, any financial gain Yale may receive from facilitat-
ing the misappropriation of Johnson's theory is much too attenuated to be actionable under CUTPA.

Thus, it is the Court's prediction that the Connecticut Supreme Court would conclude that neither Yale's conduct, nor Schmitz and Skelly's actions, come within the purview of CUTPA. *See Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 401 (2d Cir. 2000) ("In the absence of a decision from a state's highest court, a federal court sitting in diversity must predict how that state's highest court would resolve a question of state law ..."); *First Investors Corp. v. Liberty Met. Ins. Co.*, 152 F.3d 162, 165 (2d Cir.1998). Accordingly, the Defendants' Motion to Dismiss Counts Seventeen and Eighteen are granted.

## IV. CONCLUSION

Defendants' Motion to Dismiss [doc. # 21] is DENIED, in part, and GRANTED, in part, as follows:

As to plaintiff's breach of express contract (Count 5), breach of implied contract (Count 6), breach of fiduciary duty (Count 7) and negligence claims (Counts 8 and 9) defendants' motion is DENIED.

As to plaintiff's allegations of defamation (Counts 11 and 12) and CUTPA violations (Counts 17 and 18), defendants' Motion is GRANTED.

IT IS SO ORDERED.