[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
 BACKGROUND
On March 20, 2000, the plaintiff, Stella Chertkova, filed a four count substitute complaint against the defendant, Connecticut General Life Insurance Company (CGLIC), alleging blacklisting in violation of General Statutes § 31-51,[1] invasion of privacy by false light, defamation and tortious interference with business relationships. The plaintiff was employed by the defendant as a computer programmer from June of 1992 until July of 1994. The events culminating in the defendant's termination of the plaintiff's employment were the subject of a federal lawsuit brought by the plaintiff in 1993.[2]
The plaintiff, who is pro se in this action, has brought suit against her former employer, CGLIC. Her claims, however, are against CIGNA, CGLIC's parent company. Count one alleges that after leaving the defendant's employ, the plaintiff was hired by other employers and that she performed well for all of them. (Complaint, ¶ 7. p. 2.) Notwithstanding her satisfactory performance, the plaintiff alleges that she was terminated by two of those employers, Keyport Life Insurance and Connecticut Specialty, ORION Corporation (ORION), and almost terminated by a third, Alliance Capital,[3] after "CIGNA gave [them] information . . . which caused or persuaded one or more [of them] to terminate her employment in violation of [§] 31-51. (Complaint, ¶ 9, p. 3.) Count two alleges that CIGNA passed information to subsequent employers describing her "as a trouble-maker, poor communicator and a frivolous CT Page 8945 litigator, thus placing [her] in false light." (Complaint, ¶ 12, p. 4.) Count three alleges that CIGNA published to third parties that the plaintiff was a poor performer" and that such remarks were "defamatory per se." (Complaint, ¶¶ 15-16, p. 4.) Count four alleges that CIGNA wilfully and maliciously took action to cause one or more of the plaintiff's employers to terminate the plaintiff and thereby tortiously interfered with the plaintiff's business relationships. (Complaint, ¶¶ 19-23, p. 5.)
On February 1, 2002, the defendant filed a motion for summary judgment on all counts on the ground that the plaintiff has failed to produce any evidence during the course of discovery to support her claims. The defendant moves for summary judgment on the plaintiff's blacklisting claim on the additional ground that § 31-51 does not create a private right of action. The defendant moves for summary judgment on the plaintiff's invasion of privacy by false light and defamation claims on the additional ground that the plaintiff is collaterally estopped from relitigating the issue of whether she had work performance problems while in the defendant's employ.[4]
 DISCUSSION
Pursuant to Practice Book § 17-49, "summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Citations omitted; internal quotation marks omitted.) Witt v.St. Vincent's Medical Center, 252 Conn. 363, 368, 746 A.2d 753 (2000). "It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue." Maffucci v. Royal Park Ltd.Partnership, 243 Conn. 552, 554-55, 707 A.2d 15 (1998). "[A] summary disposition . . . should be on evidence which a jury would not be at liberty to disbelieve and which would require a directed verdict for the moving party." (Internal quotation marks omitted.) Miller v. UnitedTechnologies Corp., 233 Conn. 732, 751-52, 660 A.2d 810 (1995).
As a preliminary matter, the defendant, in its memorandum of law, argues that it is entitled to summary judgment on all counts because the plaintiff has not accused anyone at CGLIC of having communicated with the CT Page 8946 plaintiff's subsequent employers but, instead, claims that someone at CIGNA, most likely someone in its legal department, was responsible for the communications. (Defendant's Memorandum, p. 13.)
"[I]t is a fundamental principle of corporate law that the parent corporation and its subsidiary are treated as separate and distinct legal persons even though the parent owns all the shares in the subsidiary and the two enterprises have identical directors and officers. Furthermore, the separate corporate entities or personalities of affiliated corporations will be recognized, absent illegitimate purposes, unless: (a) the business transactions, property, employees, bank and other accounts and records are intermingled; (b) the formalities of separate corporate procedures for each corporation are not observed . . . (c) the corporation is inadequately financed as a separate unit from the point of view of meeting its normal obligations . . . (d) the respective enterprises are not held out to the public as separate enterprises; (e) the policies of the corporation are not directed to its own interests primarily but rather to those of the other corporation." (Citations omitted; internal quotation marks omitted.) SFA Folio Collections, Inc.v. Bannon, 217 Conn. 220, 232, 585 A.2d 666 (1991); see also UnitedStates v. Bestfoods, 524 U.S. 51, 55, 118 S.Ct. 1876, 147 L.Ed.2d 43
(1998) ("It is a general principle of corporate law that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries.")
At her deposition, the plaintiff testified:
 "Q. Okay. And in fact in paragraph two you use — you say defendant, Connecticut General Life Insurance Company, and then you say, quote, CIGNA, quote. So that CIGNA refers, in that context, [to] Connecticut Life Insurance Company?
"A. Oh, well, I see a problem here and . . .
 "Q. Okay. Well, just tell me what the problem is, and we'll work it out
"A. The problem is that the defendant is CIGNA.
"Q. Okay.
"A. Even though I was employed by Connecticut General Life Insurance Company and my first lawsuit was against Connecticut General Life Insurance Company. The second, this one, is against CIGNA CT Page 8947 and so to that extent, I think that the defendant is not properly designated here.
* * *
 "A. I'm not accusing actually anyone who worked with me. I'm pretty sure that it was done on a lot higher level, and it was done by people who were involved in the litigation."
(Defendant's Exhibit B, pp. 45-46 and 81.)
The court agrees, based on the plaintiff's deposition testimony and pleadings, that she has sued the wrong party and that the defendant is entitled to judgment as a matter of law on this ground alone. Notwithstanding, the court shall address the defendant's other grounds for summary judgment.
The defendant argues that it is entitled to summary judgment on all counts because the plaintiff's claims — blacklisting, defamation, false light invasion of privacy and tortious interference with business relations — require evidence that the plaintiff cannot produce, namely that a representative of CIGNA contacted the plaintiff's subsequent employers. The plaintiff argues that although she has no direct evidence that communication between CIGNA and the plaintiff's employers took place, she has strong circumstantial evidence. (Plaintiff's Memorandum, p. 2.) The circumstantial evidence upon which the plaintiff relies in order to establish her claim that the defendant contacted Alliance Capital is (1) Alliance Capital used CIGNA as its health care insurance provider; (2) CIGNA learned at a 1994 deposition that the plaintiff did consulting work for Alliance Capital; and (3) other consultants were hired after the plaintiff was informed that she would be let go for budgetary reasons. (Plaintiff's Memorandum, p. 5.) The circumstantial evidence which the plaintiff argues supports her claims with respect to Keyport Insurance Company consists of (1) an executive at Keyport formerly worked for CIGNA; (2) the plaintiff's work at Keyport was highly regarded; and (3) Keyport hired other consultants after letting the plaintiff go for alleged budgetary reasons. (Plaintiff's Memorandum, p. 6.) Finally, the circumstantial evidence supporting her claim with respect to ORION is that her work at ORION was highly regarded by her colleagues there until her attorney, in the federal lawsuit, faxed a copy of a document from that case to the plaintiff's office at ORION for the plaintiff to review. The plaintiff argues that the document must have been seen by others at ORION because, shortly thereafter, Donna Resutek, the plaintiff's supervisor, became highly critical of the plaintiff's job performance, culminating in the CT Page 8948 plaintiff's termination. (Plaintiff's Memorandum, pp. 27-28.) The plaintiff argues that Resutek's criticisms of the plaintiff were similar to the criticisms the plaintiff received at CGLIC (Plaintiff's Memorandum, p. 27.) The plaintiff concludes, from this, that CIGNA must have conspired with ORION to have the plaintiff fired for the same reasons she was fired from CGLIC. "[I]f CIGNA could present evidence that the plaintiff was terminated for the same problems from another company, by a female supervisor, its chances of winning the gender discrimination suit would significantly grow." (Plaintiff's Memorandum, pp. 26-27.)
"Although the elements of a cause of action may be established on the basis of inferences drawn from circumstantial evidence . . . such inferences must be reasonable and logical, and the conclusions based on them must not be the result of speculation and conjecture. . . . An inference must have some definite basis in the facts. . . . When an element necessary to a cause of action cannot be established without conjecture, the evidence presented cannot withstand a motion for a directed verdict." (Citations omitted; internal quotation marks omitted.)Boehm v. Kish, 201 Conn. 385, 389, 517 A.2d 624 (1986).
1. Invasion of privacy by false light and defamation claims
"To establish invasion of privacy by false light, the [plaintiff is] required to show that (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." (Internal quotation marks omitted.) Honan v. Dimyan, 52 Conn. App. 123,132-33, 726 A.2d 613, cert. denied, 249 Conn. 909, 733 A.2d 227 (1999). 3 Restatement (Second) Torts, Invasion of Privacy § 652E, comment a, pp. 394-95 (1977), incorporates the discussion on the difference between publication and publicity found in § 652D. "`Publication' . . . includes any communication by the defendant to a third person. `Publicity' . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication. . . . It is one of a communication that reaches, or is sure to reach, the public. . . . The distinction . . . is one between private and public communications." 3 Restatement (Second) Torts, Invasion of Privacy § 652D, comment a, p. 384 (1977). See also Venturi v. Savitt, Inc., 191 Conn. 588, 591 n. 1,468 A.2d 933 (1983); Tarka v. Filipovic, 45 Conn. App. 46, 53, 694 A.2d 824
(1997).
The plaintiff's false light claim fails as a matter of law for two reasons. First, an examination of the pleadings and submissions in this CT Page 8949 case reveals that the plaintiff has not alleged, nor does she argue, that the defendant communicated to the public at large, or caused to be communicated to the public, offensive material about her. The plaintiff alleges, instead, that some person employed by CIGNA, possibly someone in the legal department, contacted three of the plaintiff's subsequent employers, causing two of them to terminate her employment. Construing the pleadings and evidence in the light most favorable to the plaintiff, the plaintiff cannot establish an essential element of a false light claim, namely that the defendant publicized information about the her to the public. Moreover, to successfully prosecute a false light claim, evidence of what was said or written about the plaintiff is essential. This is so because without knowledge of the words that were publicized, the trier of fact cannot evaluate an essential element of the cause of action, namely the falsity of the words.
Similarly, to be liable for defamation, the court must find "that the defendants published false statements that harmed the [plaintiff], and that the defendants were not privileged to do so." (Citations omitted; internal quotation marks omitted.) Torosyan v. Boehringer IngelheimPharmaceuticals, Inc., 234 Conn. 1, 27, 662 A.2d 89 (1995). "A claim of libel must be pled with specificity, as the precise meaning and choice of words employed is a crucial factor in any evaluation of falsity. The allegations should set forth facts . . . sufficient to apprise the defendant of the claim made against him. . . . [A] complaint for defamation must, on its face, specifically identify what allegedly defamatory statements were made, by whom, and to whom. . . ." 50 Am.Jur.2d, Libel and Slander, § 434. See also Kloth v. Citibank(South Dakota), N.A., 33 F. Sup.2d 115 (D.Conn. 1998); Croslan v.Housing Authority, 974 F. Sup. 161, 169-70 (D.Conn. 1997).
In a deposition taken of the plaintiff by the defendant, however, the plaintiff admits that she has no evidence of what statements were made about her, when they were made, to whom they were made or even who might have made them:
 "Q. Do you have any documents that show any communications made between [the defendant] or any CIGNA related entity [and] any of your subsequent employers?
"A. No, I do not.
 "Q. Are you aware of any documents you can identify that exist but you don't have copies of?
"A. I doubt that there are documents. I am pretty sure CT Page 8950 that communication was verbal.
 "Q. This would include . . . it would include documents, for example, that you created, notes that you took about conversations with someone who said to you, yes, I had such a conversation. Are there any such documents like that that exist?
 "A. There is — not only there is no documents like that, but I don't think it would be viable for me to have any documents like that because what I imply in this lawsuit [is] that communication was done on a very high level and done by the people whom I don't know and in a very careful manner. So it would be totally unreasonable to expect that I might have something in writing.
 "Q. But what I'm saying is have you spoken to anyone who has indicated to you that any such communications took place and then you took notes of that conversation?
"A. No, I have not.
 "Q. Okay. Have you attempted to interview anyone about whether such communications took place?
"A. No, I have not."
"Q. What do you think that CIGNA told them?
 "A. She's a bitch; let her go. Something like that. It's very simple.
"Q. She's a bitch; let her go?
 "A. Well, I'm being facetious, of course, but I have no idea what they — what they exactly told, but they expressed their definite. . . ."
(Defendant's Exhibit B, pp. 22-23 and p. 33.)
In the same deposition the plaintiff testifies:
"Q. I just want to be clear — or just so I am CT Page 8951 clear, it was your attorney . . . who sent that fax. It was your attorney's office. It wasn't anything that — you're not claiming that CGLIC sent that fax to you to try to get you fired?
"A. Oh, no. I don't claim that. No.
 "Q. Okay. And so your feeling is that because you were terminated by Orion on October 30, the same month that this fax was sent to you, that that played a role in Orion's decision to terminate you?
"A. This is one of the reasons that makes me believe.
"Q. What are the other reasons?
 "A. Well, there are many reasons. First of all, I am not sure that this was the only source of information for Orion. There could be other ways where CIGNA contacted Orion directly. I don't rule that out at all. And CIGNA had access, again, to — Orion is a client of CIGNA or was at that time. They were using CIGNA's health insurance, so also, when I was diagnosed with cancer I used CIGNA's — I still had cobra with CIGNA.
"Q. And how does that link with Orion, I'm sorry?
 "A. Well, CIGNA knew of my condition and knew where I worked, and so there are many links to CIGNA. I'm not saying that it happened through health services. Probably, it's more likely that other means of communication took place, but there were a number of links between Orion and CIGNA.
 "Q. I understand you're saying there's a number of links. But other than the fact that there are these links, do you have this evidence that someone at one of the CIGNA health care organizations contacted Orion about you in an attempt to get you fired?
"A. Well, I didn't say that one of CIGNA's health organizations did that. I didn't say that at all. CT Page 8952
"Q. Okay. Are you claiming that?
 "A. No. I'm claiming that CIGNA, again, an active area at CIGNA, whether it's corporate or legal, and they could have found link through health care. But I'm not saying health care by itself would not initiate it. It just wouldn't make sense for them.
 "Q. And when you say, found link through the health care, what do you mean by that? What was it about the fact that Orion had some kind of CIGNA health care plan that would have affected how corporate or legal at CIGNA behaved toward you? I'm just not understanding the significance of the link.
 "A. Okay. The link that I'm saying that CIGNA had means of influencing Orion because Orion was CIGNA's client. And so on the high level, it would be very easy for CIGNA to influence Orion.
 "Q. Are you suggesting that CIGNA could have said or would have said to Orion, if you don't fire Mrs. Chertkova, we're going to cancel your health insurance policy?
"A. Of course not, I'm not.
 "Q. That's what I'm trying to say. I'm trying to think, understand how you think they might have influenced them.
 "A. I — well, I think that CIGNA's would have knew to do it. I think if CIGNA's executive vice president called Orion's executive vice president and said, well, do me a favor, you have this such and such employee, would you terminate her she is a real — she deserves it, they would do it. It's just that type of link. It's a big business, so they wouldn't have to threaten or go that far that they would cancel the contract, or they could offer some small favor to Orion for that. There are many ways that business transactions take place."
(Defendant's Exhibit E, pp. 65-68.) CT Page 8953
Based on the deposition testimony and pleadings submitted in this case, it is clear that the plaintiff cannot establish the essential elements of her defamation and false light claims without resort to impermissible speculation and conjecture. "When an element necessary to a cause of action cannot be established without conjecture, the evidence presented cannot withstand a motion for a directed verdict." (Citations omitted; internal quotation marks omitted.) Boehm v. Kish, supra,201 Conn. 389. The defendant is, accordingly, entitled to summary judgment as a matter of law.
2. Blacklisting claim
Assuming, arguendo, that § 31-51 establishes a private cause of action, the plaintiff's blacklisting claim fails for the same reasons her false light and defamation claims fail. First, the plaintiff has no witnesses or documentary evidence to substantiate her suspicions that CIGNA contacted her subsequent employers. Second, § 31-51 provides, in relevant part, that "the provisions of this section shall not be construed so as to prohibit any person, or any officer or agent of any corporation, company, [on firm . . . from giving a truthful statement of any facts concerning a present or former employee. . . ." (Emphasis added.) Thus, without evidence of what was communicated about the plaintiff and in what context, the trier of fact cannot evaluate the truthfulness of the statement. The defendant is, accordingly, entitled to summary judgment as a matter of law as to the blacklisting count.
3. Tortious interference with business relationship claims
"[N]ot every act that disturbs a contract or business expectancy is actionable. . . . [F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . ." (Citations omitted; internal quotation marks omitted.) Daley v. Aetna Life Casualty Co.,249 Conn. 766, 805-806, 734 A.2d 112 (1999).
As with the first three claims, the plaintiff has presented no evidence to the court, beyond her own suspicion and conjecture, to establish that CIGNA tortiously interfered with the plaintiff's business relations. The defendant is, accordingly, entitled to summary judgment as a matter of law.
 CONCLUSION. CT Page 8954
For the foregoing reasons, the defendant is entitled to summary judgment as to all counts of the plaintiff's complaint as a matter of law.
Berger. J.